## Shannon *et al. vs* Frost *et al.*

APPEAL FROM THE FRANKLIN CIRCUIT.

*Equity Jurisdiction.*

CHIEF JUSTICE ROBERTSON delivered the opinion of the Court.

CHANCERY.

Case 71.

*October* 27.

The case stated and object of the bill, and decree of the Circuit Court.

In this case two discordant and dislocated parties of a Baptist Church, as originally organized in Frankfort, are litigating their respective claims to the use of a house of public worship, erected by that Church, on ground conveyed in 1827, by Henry Crittenden and wife, to Reuben Anderson, James Shannon, Benjamin Hickman, Robert Johnson, and Henry Wingate, in trust " for the use and benefit of the Baptist Society in the town of Frankfort, known by the (name of) the Frankfort Baptist Church of the county of Franklin."

On the 27th of March, 1841, the said James Shannon and six other members of the said Church were excommunicated by a vote of a majority of the other members. The expelled members, associating with some other persons professing the same religion, organized themselves into a separate community of christians, and having elected three persons as trustees to fill vacancies occasioned by the deaths of Anderson and Hickman, and the removal of Johnson from Kentucky, they procured from the County Court of Franklin a ratification of that election. Afterwards, insisting on their right still to enjoy, to some extent, their accustomed use of the house built for and still occupied by the original Church, they took possession and made periodical uses of it without the consent and in defiance of the prohibition of that Church. Collisions and complaints, unpleasant and injurious to both parties ensued, and became apparently so determined and aggravating as to leave no hope of voluntary reconciliation or peace. To settle this disagreeable controversy, and secure the exclusive and undisturbed possession of the house, the members of the Church, as originally constitued, invoked the intervention of the

SHANNON *et al.*
*vs*
FROST *et al.*

civil power by filing a bill, (in the name of a committee appointed for that purpose,) for enjoining Shannon, Dudley, and all others co-operating with them, from using the house or disturbing the complaining party in the peaceful and exclusive use and enjoyment of it for devotional services.

One Circuit Judge having granted the injunction as sought in the bill, another dissolved it before an answer had been filed; and, on application to one of the Judges of this Court, it was re-instated in a modified form by the following order:

Orderreinstating the injunction by the Chief Justice of Kentucky.

"Not doubting the jurisdiction of the civil tribunals of the Commonwealth to protect christian societies in the proper and undisturbed enjoyment of their religious exercises, the rightful enforcement of their ecclesiastical discipline, and the peaceful occupancy and use of their property in their own way, and according to the laws of the land; and being satisfied that the allegations of the bill in this case, (being admitted to be true, as they must have been, on the motion to dissolve the injunction,) a *prima facie* case is exhibited, authorizing the Chancellor to enjoin the defendants *from preventing the complainants and their associates from enjoying, without obstruction, the use of their church building and its appurtenances, and to enjoin them also from exercising any control over said property, or the use thereof, and from all intermeddling therein, as Trustees or otherwise*—I, George Robertson, Chief Justice of Kentucky, do therefore, re-instate the injunction in this case, excepting only so far as it might be understood as inhibiting the defendants, as citizens, from participating in the proper use of the house, as the people generally are permitted to enjoy it, on occasions of public worship, in subordination to the controlling influence of the complainants and their associates as an organized ecclesiastical body, entitled to the government of their church as charged in their bill, until the contrary shall be made to appear."

"G. Robertson, Ch. Jus., Ky.

"To the Clerk of the Franklin Circuit Court."

Answer.

After the reinstatement of the injunction, the persons who were made defendants, answered the bill, denying

that the expulsion from the Church was either regular or valid, or for any good cause; insisting that they still had a right, as an organized community of christians, to use the house as a place of social worship as often as one night in every week and two days in every month, and asseverating that they never claimed or attempted to exercise any control over it for any other purpose or to any greater extent.

On the final hearing, the Circuit Judge, being of the opinion that the Statute of 1814, (2 *Digest*, 1347,) does not apply to this case, decreed a vacation of the appointment of new trustees; a removal of the three survivors of the original trustees, Shannon, Johnson, and Wingate, and an election of five new trustees, by all the white members of the church, as constituted before the expulsion of a portion of them, and appointed a commissioner to hold and superintend that election, and report the result to the Court.

The defendants have appealed, and the complainants have assigned cross errors.

In revising the decree, the first and most radical question which presents itself is, whether the Statute of 1814, applies to the case in any respect.

That enactment is in these words:

"*Be it enacted by the General Assembly of the Commonwealth of Kentucky,* That if any society or sect of christians in any part of this Commonwealth, shall heretofore have associated, or hereafter shall associate themselves together, in congregational form, and shall have acquired, or hereafter shall acquire a piece or lot of ground, for the purpose of erecting thereon a house or houses of worship, grave yard, and pound for horses; and shall have heretofore received, or shall hereafter receive the title of said ground, by devise or conveyance to trustees for the use and benefit of said society or congregation, and it shall become necessary, by reason of the death or removal of said trustees, or through any other cause, to appoint new trustees to support the legal estate, it shall and may be lawful for said society or congregation, by the election held by its members, or by those appointed for that purpose, according to the rules of said

SHANNON *et al.*
*vs*
FROST *et al.*

Decree of the Court, on hearing, on bill, answer, &c.

The Statute of 1814.

SHANNON *et al.*
*vs*
FROST *et al.*

society, to elect or appoint, as often as may be necessary, any number of trustees not exceeding five; and to produce the names of said trustees so elected or appointed, to the County Court of the county where the house of worship may be situated; who shall order the said names to be entered on their records; and thereupon, said trustees, so elected or appointed, shall be vested with the legal title of said land, for the use and benefit of said congregation; and shall have power to do any legal act in conducting the same which may be necessary for the uses aforesaid; and to maintain any action or actions of trespass, or other action for the safe keeping and preservation of said property, which may be necessary for that purpose: *Provided, however,* that if any schism or division shall take place in said congregation or church, from any other cause than the immorality of its members, nothing in this act shall be so construed as to authorize said trustees to prevent either of the parties so divided, from using the house or houses of worship, for the purposes of devotion, a part of the time, proportioned to the numbers of each party: *Provided,* that the quantity of real estate hereafter acquired by any religious society, and vested in trustees and their successors under this act, shall not exceed [four acres of land:] *Provided,* that nothing in this act shall be construed to authorize the minority of any church having seceded from, or been expelled, or excommunicated from the church or congregation, from interfering in any manner, in their appointments for preaching or worship, with any appointment for similar purposes, which may have been made by the body or the major part of such church or congregation."

After a careful examination of this Statute, we concur with the Court below in the opinion that it has no application to, or bearing on, the case now before us.

The chief object of the enactment seems to have been to prescribe a mode for transmitting to new trustees the legal title to church property after the death or removal of the trustees to whom it had been originally conveyed, and to vest such appointees with all the powers of their predecessors, qualified, *as to the former,* by the provisos. The act does not, in either letter or purpose, apply

The object of the Statute of 1814, was to prescribe a mode for transmitting the legal title to church property, after the death or removal of trustees, to successors.

to a church or the trustees of a church, when the church property is still held by the trustees or the heirs of the trustees to whom the title was first conveyed or devised as a charity.

SHANNON *et al.*
*vs*
FROST *et al.*

sors, and to vest the title in them as it had been held by former trustees, with the qualifications contained in the provisos.

"Said trustees," in the first proviso, evidently refers only to the proximate antecedent, to wit, the trustees provided for by the act itself, and elected by the church.

Moreover, the power of the Legislature to prescribe the duties or curtail the conventional rights of the original trustees, as recognized by the law existing when their title first accrued, might be, at least, seriously doubted.

But the Legislature had undoubted authority to provide that, if a church should choose to avail itself of the prvilege of supplying new trustees as prescribed in the act of 1814, it should do so, subject to the condition that the new *trustees*, in the event of a division in the church, resulting from any other cause than immorality, should not be authorized, *by any thing in the enactment*, to prevent either of the divided parties from using the house of worship for devotional purposes, "a part of the time, proportioned to the number of each party."

As churches are unincorporated bodies, the legal title of their trustees would descend to the heirs of those trustees, and thereby the beneficiaries might be subjected to great inconvenience, and even privation. To obviate such consequences, the act of 1814 authorizes the transmission of the title to the appointees of the Church, on prescribed conditions. This, together with a prospective restriction as to the quantity of church ground, was the sole object and is the only effect of that enactment. It does not apply, therefore, to a church which has not elected any trustees as successors of those in whom the legal title of its property was first vested; and consequently it is totally inapplicable to this case, unless the trustees elected by the expelled and minor party are legally invested with the title to the house and ground of the entire church as constituted before the dismemberment.

The title to real property, of unincorporated bodies, vested in trustees, on their death vests in their heirs. To obviate this state of case the act of 1814 was passed.

But this cannot be—1st. Because a majority of the original trustees still survived, and were competent to act in their proper fiducial capacity—and 2d. Because a minority, if unexpelled, had no right to elect trustees for the

A minority of a church in whom title to real property is vested in trustees, have no right, under the

SHANNON *et al.* *vs* FROST *et al.*

majority, and the expelled persons had no right whatever to appoint trustees for the Church of which they were no longer constituent members.

*Statute of 1814, to elect trustees for the majority, especially as a competent number of trustees survived.*

Consequently, the rights of the parties in this case must depend on the terms and legal effect of the conveyance from Crittenden and wife, for the benefit of the then organized Baptist Church of Frankfort, and on the acts of that church for governing and preserving itself, as a distinct christian society, and on the common law of the land.

What then are those rights as thus tested?

This Court, having no ecclesiastical jurisdiction, cannot revise or question ordinary acts of church discipline or excision. Our only judicial power in the case arises from the conflicting claims of the parties to the church property and the use of it. And these we must decide, as we do all other civil controversies brought to this tribunal for ultimate decision. We cannot decide who ought to be members of the church, nor whether the excommunicated have been justly or unjustly, regularly or irregularly cut off from the body of the church.

*The Court cannot revise ecclesiastical decisions, but may decide the right of property and the use thereof.*

We must take the fact of expulsion as conclusive proof that the persons expelled are not now members of the repudiating church; for, whether right or wrong, the act of excommunication must, as to the fact of membership, be law to this Court.

*—Nor decide upon the regularity of an excommunication, but the fact it may decide.*

For every judical purpose in this case, therefore, we must consider the persons who were expelled by a vote of the Church, as no longer members of that Church, or entitled to any rights or privileges incidental to or resulting from membership therein.

As the conveyance from Crittenden was to the use of the Baptist Church, as an organized body of professing Christians in Frankfort, every member of that Church has a beneficial interest in the property thus conveyed, so long as he or she shall continue to be a member, but no longer. It is only as a constituent element of the aggregated body or Church, that any person can acquire or hold, as a *cestui que trust*, any interest in the property thus dedicated to that Church: *Curd et al.* vs *Wallace et al.* (7 *Dana,* 195.) Such is the effect of this conveyance to congregational

*A conveyance of real property to a Church, vests in each member so long as he or she shall continue such a beneficial interest therein.*

uses, and such the civil law of our State ; and upon this foundation alone, must our decision rest. The judicial eye of the civil authority of this land of religious liberty, cannot penetrate the veil of the Church, nor can the arm of this Court either rend or touch that veil for the forbidden purpose of vindicating the alledged wrongs of the excinded members. When they became members they did so on the condition of continuing or not, as themselves and their Church might determine. In that respect they voluntarily subjected themselves to the ecclesiastical power, and cannot invoke the supervision or control of that jurisdiction by this or any other civil tribunal.

Then, not being now members of the Church to whose use the ground was conveyed, the appellants seem no longer to be entitled to any beneficial interest in that property, nor to any other right which this Court can either enforce or recognize ; and consequently the old Church, as organized at the date of that conveyance, and still subsisting, must be deemed to be entitled to the exclusive use and enjoyment of the property for all the purposes for which it was first dedicated. And, as that right is of the character of a trust, is it not the duty of a Court of Equity to uphold it and secure its full and undisturbed enjoyment? Such was the purpose of the modified reinstatement of the injunction. The unanswered bill alledged an exclusive right in the complaining party, and a persevering and vexatious disturbance of that right, which authorized a restraining process. And the answer and proofs, now in the record, though they may show an apology for that disturbance, do not change the essential facts of the case as to the civil rights of the parties. The injunction might, therefore, with propriety, have been perpetuated or prolonged as the only or best civil means of preserving peace, preventing multiform litigation, and securing the undisturbed enjoyment of the property to those who, according to the law of the Court, seem now to be entitled to claim the exclusive use.

It results also from the foregoing view of the case, that there was no cause for removing Wingate as one of the original trustees. The only fault imputed to him is his adherence to the Church and lawful resistance of the claim

Excommunicated members of a Church to which property has been conveyed, have no such interest therein as will authorize them to maintain a suit in relation thereto.

SHANNON *et al.*
*vs*
FROST *et al.*

by the expelled members to the control of the house to which he holds the legal title as one of the surviving trustees. And, in all this, he cannot have violated his trust or shown himself unworthy of it, if, as we have already decided, the Church for whom he has thus acted, is entitled to the exclusive use of the house, and had, as appears, chosen to claim and enjoy it.

As Shannon, believing that his party had rights, which cannot be here recognized, acted for that party and himself, in opposition to the exclusive title of the only rightful beneficiaries, and may so act again, if he should retain his authority as a trustee, we cannot disapprove so much of the decree as removed him from the trust.

And as to Johnson's removal also, we will only add, that, as he had left the State permanently, and the more especially as he did not, in his answer or otherwise, resist the prayer for amotion, we will not reverse.

As there is no assignment of error, either for not perpetuating the injunction or for removing Wingate, we could not reverse the decree on either of those grounds thus not complained of. Nevertheless, the decree must be reversed on the cross errors which *are* assigned; that is, that the Circuit Court erred in requiring an election of trustees, and in prescribing the mode of election.

Were it admitted that there might be an election to supply vacancies before the death or removal of all the original trustees, yet, even on that hypothesis, the Church itself should be the sole arbiter of the question whether, or when, or how, it shall elect new trustees. The appellants, not being members of that Church, nor entitled therefore, to any beneficial interest in the Church property, should not, more than other strangers, have any voice in that matter, either in the election or in deciding whether there shall be one. Nor could the Court, therefore, have any authority, at their instance and against the will of the old Church, to require an election. The bill does not ask the Court for any aid in the appointment of trustees. The Court should not, therefore, appoint trustees, *ex officio*, nor require the election of trustees.

Excommunicated Church members

We are consequently of the opinion that the enlightened Chancellor went too far in requiring an election,

and also in prescribing the time and manner of it, and in providing that the persons who had been expelled might cast votes, which we would consider as illegal, as they would have been hopeless and unavailing.

SHANNON *et al.*
*vs*
FROST *et al.*

bers have no longer any right to vote in the election of trustees.

The decree must, therefore, be reversed on the cross errors as assigned. And, of course, after the return of the cause to the Court below, it will be open for such a final decree as to the injunction, as may be asked for consistently with this opinion. And Wingate will still be a trustee, unless he shall voluntarily elect to resign or be removed, or the Church itself shall desire his removal.

But the necessary consequence of the view we have taken of the proprietory or usufructuary rights of the parties is, that there can be no reversal of the decree on the errors assigned by the appellants. Having once associated themselves with many others, as an organized band of professing christians, they thereby voluntarily subjected themselves to the disciplinary and even expulsive power of that body. The voice of the majority has prevailed against them. They have, by that fiat, ceased to be members of that association, and with the loss of their membership they have lost all the privileges and legal rights to which, as members, they were ever entitled. Their only remedy now is, therefore, in their own bosoms, in a consciousness of their own *moral* rectitude, and in the consolations of that religious faith and those christian graces which, under all temporal trials, will ever sustain the faithful christian and adorn the pathway of his earthly pilgrimage. Their expulsion ought not to brand them with *"immorality."* In this record there is no proof of immoral conduct in either the popular, the ethical, or the biblical sense. They were expelled for alledged non-conformity and contumacy adjudged against them, without a formal trial or hearing, by a dominant majority, as fallible, perhaps, as themselves; self-doomed to the uncontrolled will of a majority of a Church selected by themselves, they can obtain no redress in this forum. If their sentence be unjust, the only appeal is to the omniscient Judge of all.

We will only add, that we have no doubt that this suit is maintainable, as brought, in the names of a committee

A committe of a Church appointed for that pur-

pose, may properly, as parties, litigate the rights of the church before the civil tribunals of the country.

appointed for that purpose, by the multitudinous beneficiaries constituting the Church, and who could not conveniently, or perhaps successfully prosecute the suit in their own individual names, to a final decree, within reasonable time, if ever.

Decree reversed on cross errors, and cause remanded.

*Hewitt and Owsley & Goodloe* for appellants: *Morehead & Reed and Cates & Lindsey* for appellees.