Welch, C. J.,
dissenting. I can not concur in the opinion. I think the plaintiffs have made no ease to justify a court of equity in disturbing the defendants in the possession of this property.
The property was donated to a religious organization, by the name which it had already adopted, “ The Ohio Yearly Meeting of the Society of Friends,” and the donation was unconditional, unless there be a condition implied in the name itself. For many years, and up to 1854, the defendants and their predecessors in office held and controlled the property., for and on behalf of the society, as and being its admitted officers and agents. They have held it ever since, claiming to be such officers and agents. It is now sought to dispossess them, on the alleged ground that by an election of the society, held in 1854, or by subsequent action of other like societies, they have been superseded in office by the election or installation of the plaintiffs. The burden of proof to sustain one or the other of these grounds of claim rests on the plaintiffs. They must show a legal election of Binns in 1854, or they must show that Hoyle has since been ousted, and Binns installed as his successor, by the judgment or authoritative order of some superior tribunal, to which the Ohio Yearly Meeting is subordinate. That they have failed to show either, is to my mind quite plain.
Briefly stated, the essential facts in relation to the election in 1854 are these: Hoyle was admittedly the regular and lawful clerk of the meeting, and acted and was acknowledged as such by unanimous consent. By the constitution or “Book of Discipline” of the society, by the society’s unbroken practice, and by well-known parliamentary usage, Hoyle’s enunciations, or entries, made by him as such clerk, bona fide and understanding^, are conclusive evidence of the vote or “sense” of the meeting. *311 Hoyle did bona fide and understandingly, and -while admittedly he was the sole clerk of the meeting, announce to the meeting, and afterward enter in its regular journal, the fact that “ the delegates had failed to unite on a clerk,” and “ that the old clerk was continued in office.”
This enunciation and entry, I say, are conclusive. They are conclusive, not only because of their official character, as the utterance and act of the only proper organ and officer of the meeting, but also because of their undeniable truth. It was not only true that the delegates had failed to unite, but also that the meeting had failed to unite, and that, therefore, as a matter of necessity, as well as in conformity to unbroken former usage, the old clerk zoas continued. It was not only true that both the meeting and the delegates failed to unite, but it was true that a “ large majority of both ” were in favor of “ continuing the old clei’k,” and opposed to the election of Binns; and had Hoyle made an entry to the effect that the meeting had “ united ” on Binns, or given their “ solid sense ” in his favor, the entry would have been a glaring falsehood, for which he would have deserved impeachment.
That it is the general law of deliberative bodies that such an enunciation by its organ, and entry by its authorized clerk, are conclusive proof of the result of an election, needs no authority to prove. That this law is applicable to the proceedings of yearly meetings of the Society of Eriends, and that it is in fact so made applicable by their hooks of discipline and usages, is expressly held in Field v. Field, 9 Wend. 402, and in Earle v. Wood, 8 Cush. 467. In the former case, the court held the act of the clerk to be conclusive, although he was sustained by only a minority of the members. The latter case, Earle v. Wood, was really the foundation of the present case. It was the controversy between the Gurneyites and Wilburites, in the New England Yearly Meeting, and was decided in favor of the former, who supported the old clerk under circumstances substantially similar to those of the present case. Chief Justice Shaw, in delivering the opinion of the court *312 in the case, says, that the election of a clerk for the yearly meeting “is an act which can only be done in pursuance of the ‘solid sense’ of the whole body, taken, declared, and minuted by its only acknowledged regular officer.”
This being the law of the case, it matters not whether we find, from the evidence, that, by the rules of the society, the election of clerk was a matter belonging exclusively to the delegates, or whether we hold that the meeting had the right to take it out of their hands, and decide for themselves. The entry of the clerk is a conclusive negative to the proposition that Binns was elected, either by the delegates or the meeting, by solid sense, by a majority, or otherwise.
That Binns was elected by a majority of the delegates, or by a majority of the meeting, is not claimed. The claim is, that the entry of the clerk is not conclusive, but that we may go behind the entry, and inquire into its truth; and that the evidence shows that the meeting, acting by a minority of its members, did “ unite ” on Binns, or give its .solid sense in favor of his election. In other words, it is claimed that a minority represented the solid sense of the meeting, and that the regular clerk refusing to make an announcement and entry to that effect, the clerk thus chosen made the entry himself, which the old clerk should have made. This is the claim, as I understand it.
I confess it is difficult for me to reply seriously to such an ai'gument. "What is the “ solid sense ” of the meeting ? Does it mean the opinion of its most solid members — the opinion which is supported by the greatest weight of intelligence, morality, and piety ? If so, who but the clerk is to weigh the characters of the voters, and determine which side of the scales preponderates. That the preponderance here was in favor of .Hoyle is well established, without the aid of the entry which he made as clerk; for there is no 'syllable of evidence to show, nor is it pretended, that the majority who favored his election were not equal in intelligence, morality, and piety to the minority who supported Binns; nor does the entry subsequently made by Binns *313 assert that the “ solid sense” of the meeting was for Binns, or that the meeting united on him, but merely shows that “ part ” of the meeting united on him.
It makes no difference, therefore, whether we are to understand this peculiar expression, “ solid sense,” as indicating unanimity, majority, or weight of character. In neither sense was the “ solid 'sense ” of the meeting in favor of Binns. But I deny that the last named is thé true Quaker meaning of the phrase. If that is the meaning, it is an anomaly in Quakerism, and a strange departure from one of the foundation principles of the sect, namely, the perfect equality of all men in point of privilege and power. If such be its real meaning, why is the minute-book so full of entries that the meeting “failed to unite?” Was there a tie, vote or a perfect equilibrium of character, in all such cases? By no means. The phrase originally meant unanimity, or at least an approximation to it — substantial unanimity. The word “ unite,” when applied to the meeting, I also understand in the same sense. The true Quaker idea, underlying these expressions, is the belief that an unerring divine spirit, as in the day of Pentecost, moves the people to act with “ one accord.” To “ unite ” is to become a unit. “ Solid sense,” when applied to an aggregate of individuals, means the sense or opinion of the whole, just as in solido means by the whole, or as consolidate means to unite many in one. Had a serious division of opinion been contemplated, and a weighing of the character or worth of the voters intended, it is highly improbable that any such form of expression as “solid sense” or “unite” would have found a place in their book of discipline, or have been thought of. Instead of “ solid sense,” the words would have been “prevailing sense,” “ preponderating sense,” “ better sense,” or “ sense of the majority; ” and the word “ unite ” could have had no application whatever. Certainly no true Quaker -could ever intend that any question should be carried by less than a majority of the deliberative body.
But, as I have said, it matters not what meaning we assign to these words, or whether we rest the defendants’ *314 case upon the official character of the clerk’s entry, or upon its truth. If the evidence shows anything, it shows that both delegates and meeting did “fail to unite” on any one as clerk. Much more does it show, that both bodies failed to unite on Binns. It shows that twenty-eight of the forty-two delegates, and a “ large majority” of the meeting, including at least two of the remaining fourteen delegates, were opposed to the election of Binns, and in favor- of continuing Hoyle in the office. IToyle’s election stands, therefore, trebly proven — by the clerk’s entry, by the failure to unite on any successor, and by the admitted fact that a majority was in his favor. Eor it is to be observed, that, in order to validate the continuance of Hoyle in office, it is not necessary to show that he was re-elected, or that there was an entry in the minute-book, as there in fact was, to the effect that he was continued in office. It is enough for that purpose to show that no successor was elected. This was expressly held in Hendrickson v. Shotwell and wife, 1 Saxton Ch. 577, and is abundantly shown by the testimony as to the usages of the society.
The argument that Binns was elected seems to be based wholly upon the fact that “more than the usual number” seconded his nomination, and that at the particular time when his name was proposed to the meeting but few made known their objections. I must express my surprise at this argument. To give to it any weight would be to stick in words and disregard facts, and to hold that the election was a battle of noises and not of opinions. The “ usual ” number is no criterion in a case like this, where there was an actual and serious division of sentiment. Usually there is no division, and one or two voices — nay, silent acquiescence— is sufficient to show assent. Here there was known and serious opposition; and there were two good reasons why the quiet and good order of the meeting was not disturbed by reasserting that opposition at the particular time. One of these reasons was that it was unnecessary to do so, the fact of such opposition having already been sufficiently made *315 known. It had been made known by the report of Hall and by the total absence of objection to that report, and then by the announcement of the clerk that he should entertain the report, and in pursuance of it would record the continuance of the old clerk. Another reason for not making a clamorous outcry of opposition at the particular time mentioned, and which was publicly proclaimed as such reason, was that the majority, having already acted in the matter, did not wish to participate in the separate action of the minority, lest their participation might he construed into an acknowledgment that the separatists were the true yearly meeting. The fact of serious opposition to Binns’ election was well known before the meeting and at all stages of its proceedings, and was abundantly manifested on every decent and proper occasion, when it could be done consistently with the quiet and good order of a Quaker meeting. The plaintiffs’ own witnesses substantially admit this. Jabez Coulson himself says, “I know that more than half the meeting was opposed to the appointment of Binns.” He also says that he “believed” at the time that this majority were opposed to the election of Binns; and he admits that the silence of the majority “ might have been in deference to decency and order,’’ and that he “ did not understand that their silence was an agreement to the appointment of Binns.” Other witnesses testify to the same effect. Nathan Hall estimates the Hoyle men as “ very much more than half,” and as he supposes “ over two-thirds.” And if we take the testimony of the disinterested stenographer, who sat in the gallery and reported the proceedings, there was a preponderance of expression in favor of Hoyle, corresponding with the majority of members in his favor.
I need hardly say that I suppose the women’s meeting has nothing to do with the question. The women elect their own officers, and can give no vote and can take no part in the election of officers of the men’s meeting.
In view of these facts, I am quite unable to hold that Binns was legally elected clerk of the meeting, and that *316 those who organized under him are not separatists — provided the Ohio Yearly Meeting is to be regarded as an independent organization, and its decisions subject to no appeal to a superior jurisdiction. Indeed, the fact that such an appeal has been taken, and is prosecuted upon the ground that Hoyle has forfeited his right to the office by bad conduct, would seem to be an admission that but for that bad conduct his election would have been legal — that he was the choice of the society, but was unfit for the position. The ground on which the appeal to other yearly meetings was taken, if sustained, would show Hoyle to have been a usurper of the office for nine years preceding the election, as well as since its date, and all the acts and proceedings of the society during that time to be void. This is the ground on which it is claimed the other yearly meetings place the case. I have a copy of the proceedings of those yearly meetings, in which it will be seen that none of them place their judgment upon the ground that Binns was elected by the society. "What they assume to do, is to ostracize or excommunicate the Ohio Yearly Meeting itself, and to set up the Binns faction in its place. Take the proceedings of the Indiana Yearly Meeting as a specimen. Two reasons are given by that yearly meeting for its judgment in the premises: 1. “ That the Ohio Yearly Meeting,” not the- Hoyle party, but the meeting itself, “ has for several years past/’ by the influence of the Hoyle party, “ refused and prevented the reading of regular epistles” from the New England Society. 2. u They” — that is, the Ohio Yearly Meeting — “have permitted to have a seat in.the yearly meeting . . . persons who had been disowned in New England.” They then say that the “Friends who appointed Jonathan Binns as clerk” — not the society itself, but the individual friends who adhere to Binns — “ after enduring these disorders for years,” finally felt themselves impelled . . . . “ to appoint a clerk, and -proceed with the regular business of the yearly meeting, without the unity of that party who caused the disorders complained of.” That is to say, Binns was elected, not by the society, but by his individual *317 “friends,” without the unity of a “large majority” of the members of the society. This is a plain admission that Binns was not elected by the society, and that the election of Hoyle stood on the same basis and had the same validity as any one of his elections for the nine years next preceding. The legality of all of which seems to be now admitted. In the case of Earle v. Wood, 8 Cush. 447, it appeared that Gould was chosen clerk by his party friends, precisely as Binns was chosen by his friends in the present case, with this difference, that a majority united on Gould, whereas only a minority united on Binns. And yet the court unanimously held in that case that Gould was not elected, and that he and his adherents were seceders, giving as a principal reason for so holding, that his nomination or election was not made by the society, but, from his own showing, was made “ by those who had been for some years laboring under much oppression,” etc. That^is precisely the case here. Binns’ own entry shows that he was chosen by only a “part” of the meeting, and that “part” was a minority of the meeting.
Hoyle, therefore, having been duly continued as clerk of the society, and those adhering to him being the regularly organized society, it remains to inquire whether they have been ousted, or their election invalidated, and Binns and his adherents installed in their place by the authorized judgment of a superior tribunal.
I not only deny the existence of any such tribunal, but I deny that any tribunal has assumed to render such a judgment. When and where was any such judgment rendered, and what was the judgment? It was rendered, if at all, at as many times and places as there were yearly meetings acting on the subject, and no two of the judgments are the same. None of these yearly meetings assume to adjudge the election of Hoyle to be illegal or irregular, or to oust him from office, or install Binns. The only thing in which these several judgments concur is, that they will not hereafter “ correspond ” with Hoyle and his party, and that they will correspond with Binns and his *318 party ; and this is the utmost extent to which any of them go. Each meeting acted for itself, and upon its independent views of the case. There was no concert or community of action between them. The yearly meeting at Philadelphia, founded by the contemporaries of "William Penn, refused to unite with them in this, and holds that it is not essential or advisable to keep up such correspondences with each other. Now it seems to me that here is no judgment, no order assuming to affect the legal status of the parties. It was simply the judgment of a majoxdty of the yearly meetings, each speaking for itself, that they, respectively, would decline a correspondence, which the evidence shows to have been at all times voluntary and discretionary with each society. There was no joint session of the several societies, or delegates representing them; no jurisdiction was acquired over the persons of Hoyle or his associates, by pi’ocess, notice, consent, or othei’wise; each society assumed to represent itself alone, and to be, as each was in fact, no more than the equal of the society whose officers it assumed to condexnn. The subject-matter of the adjudication was not the legality or regularity of the Ohio election, but the dispute between the G-urneyites and the Wilbuxites of New England, as to a matter of discipline. The real judgment rendex'ed by the several societies was simply, that, ixx their opinion, Hoyle did wrong in refusing to exclude Gould, the New England Wilburite, from the meeting, and that for this reason they would refuse to correspond with him and his party, xio matter" whether he and his pax'ty represented and constituted the regular ox’ganizatioxi or not. This, I say, is no judgment affecting the status of Hoyle, or the organization under him, evexi if we concede the existexice of power to render the proper judgment for that purpose.
But was there any such power ?
In none of their utterances on the subject is there any claim of such power, and in some of them it is expressly disavowed. Take, as example, the utterance of the London Society. The following is its essential part:
*319 “ The desire consistently to carry out the principles of Christian order which have regulated our own course of action, and to counteract, as far as our example and influence may extend, the disorganizing tendencies that have so painfully manifested themselves, not only in Ohio, but also in several other of the American yearly meetings, has led us to accept the epistle signed by Jonathan Binns, under the conviction that the Friends whom he represents have been, and are, acting most in accordance with the course which this meeting adopted in 1846, and which it has ever since pursued. Yet, in so doing, we would not be understood as implying that the proceedings of that body (though we speak it with tenderness, and with sympathy for the peculiar difficulties of their position) have been, in all respects, such as we could approve, were it our place to pronounce an opinion thereon.”
It also contains the following, which shows that they did not claim the right to overrule or interfere with an election regularly made by the Ohio Society:
“ It is a principle with this yearly meeting that the several American yearly meetings with which it is in correspondence are independent bodies, whose deliberations and .decisions in the exercise of the discipline toward their own members and subordinate meetings are to be regarded as final, and not to be interfered with.”
But I deny that there is, in fact, any authority in the yearly meetings of the world, or in any number of them, either acting jointly or separately, to control the organization, discipline, or property of the Ohio Yearly Meeting, or of any one of its members. The book of discipline or constitution of the Ohio Yearly Meeting contains no word giving any such authority. It purports to be adopted for that society alone, and is entitled, “ Book of Discipline of the Society of the Ohio Yearly Meeting.” Nor is there any book, document, record, or usage giving any such authority, or acknowledging the society to be subordinate to any other. On the contrary, the book of discipline, and the evidence as to the usages of the several yearly meet *320 ings, show that the yearly meeting is the “ highest tribunal in the church organization.” This was expressly resolved by the general conference of yearly meetings held in 1849, as follows :
“ Yearly, quarterly, monthly, and preparative meetings were set up and are still continued for the purpose of church government, subordinate and accountable oné unto another —preparative to monthly, monthly to quarterly, and quarterly to the yearly meeting, the last being the highest tribunal in the church organization from whose decisions there is no appeal. . . .
“ It can not be questioned that, if a yearly meeting should manifest unsoundness in Christian faith, if it should promulgate views inconsistent with the principles professed by Friends, or should not maintain our Christian testimonies, it may then become the duty of the other yearly meetings to extend to it brotherly entreaty or admonition for its restoration. But in the exercise of those functions which legitimately and exclusively belong to itself — as the forming or administering its own discipline — any interference by another yearly meeting, or attempt to control its action in these respects, would be an infraction of our established order, and fraught with consequences perilous to the whole brotherhood of yearly meetings, against which we feel solemnly bound to bear testimony.”
This conference of 1849, like the conference of 1829-1832 — the only other conference ever held by the yearly meetings, as I understand — was exceptional and provisional, devised and held for the occasion, for the special purpose of “ healing divisions and promoting harmony.” It was abnormal and merely provisional. There is no authority, constitutional or otherwise, for calling such conferences, or authorizing any person or persons to appoint times or places for their meeting; much less is there any provision for organizing any such body, or conferring upon it any power or authority over the several yearly meetings.
The witness, William Bates, I think, truly states the re *321 lation and organization of the different yearly meetings,, when he says :
“ They are of like churches, and hold a common faith,, hut they hold no relation of subordination to any other' power. Among these religious bodies thus constituted, are what are called Congregationalists. Baptists, also, are organized on that principle; can not say as to others, but am under the impression that Disciples are organized in the same way, but in this I may be mistaken. These are-accustomed — the Baptists and Congregationalists are accustomed — to hold conferences, associations, conventions,, and the like, known by different names, which are composed of similar bodies of like denominations from the-independent churches — in which associations, etc., advice is taken, and sometimes common enterprises entered upon, and Christian sympathies expressed, and correspondence-opened with other denominations of Christians, recognized by them as being of sound or orthodox faith; but still the-churches, as to all matters legislative and judicial, or in respect to all matters of property and the like, remain in absolute independence. . . There is no common constitution ; each yearly meeting has its own constitution.”
Jesse Cope says: “ I know of no higher power than the-yearly meetings in the Society of Eriends, on all questions disciplinary, legislative, or judicial, or on questions relating to the control and disposition of property.”
William Eisher says : “ I know of no appeal from the decision and action of the yearly meetings on questions of discipline, property, etc. It is the highest tribunal, I think.”
Other witnesses testify to the same effect, and state that the correspondence between the different meetings is “ a, mere acknowledgment of fraternity;” that it is “ entirely voluntary;” and that no book of discipline “ requires or enjoins” it. There is no competent or sufficient evidence that when a member of one meeting is accredited, or “ liberated ” as a traveler, he becomes a member of other meet *322 ings. There is no testimony stronger than that of John Butler, to prove any such right of membership; and he merely says that in his “ view ” such traveling party is “ in some sense a member.” But he admits that such a party '“ would not be regarded as rightfully entitled to take part ” in the “ nomination of a clerk,” or in “ disposing of real ■estate.” In this he substantially agrees with Charles Evans, who says that such traveling party is merely “ at liberty to give a sentiment, as to what he thinks right or wrong,” but that he “ would be out of plaee in attempting to interfere with the business of the yearly meeting, so as to direct the course it should take.”
The “ meetings of sufferings,” as they are called, are evidently mere acting committees, who are accustomed to confer with each other for counsel, advice, and assistance, but with no power to bind the yearly meetings, except to the extent that funds are placed in their hands, or matters ■are referred to them.
Nothing, therefore, could be much clearer to my mind, than that these yearly meetings are independent organizations, and that the decisions of each, regarding its own matters.of discipline and government, are subject to no review by the other yearly meetings. True, there is a relationship, a “ union,” if you choose so to call it, between the different yearly meetings; but it is not a union of organization, of government, of authority. It is not an ecclesiastical union. It is a union of spirit, oí friendship, of brotherhood, of. faith. It is a “union” without organization, and without any grant of legislative, executive, or judicial power, and without the means of appointing officers to discharge the duties of .either of these several departments of government. The meetings are “ alike ” — alike in faith, in practice, and in form of organization; but they are not organically united. They are not parts of one ecclesiastical organization. They are incapable of taking a grant or devise. They can enact no law but the law of love, and are authorized to issue no mandates beyond “advice,” “ brotherly entreaty,” and “ admonition.” Like the Baptists, *323 ■Congregationalists, and others, each society, in matters of government, is a law unto itself. Their system of organization begins with the “ preparative, and ends with the “ yearly ” meeting. These together make a single organization; .above and beyond them no other .is known or provided for. In other words, they have no presbytery, no synod, no gen.eral assembly; nor do they have any pope, with power to •excommunicate the yearly meetings, or their members. The Quaker ecclesiastical system seems to embody the .smallest possible amount of man power. In this they are consistent with themselves, for a foundation principle of 'Quakerism is non-resistance and non-coercion. There is ■nothing on which to base the idea that they form a single •ecclesiastical organization, except the mere legal opinion of witnesses, and these opinions are conflicting. There is no book, document, or record on which to found them. The rights accorded by one yearly meeting to the members of another, are evidently matters of grace and courtesy, and not of obligation.
As to the argument drawn from the evidence that new yearly meetings are “set up” by the old ones, I have merely to say that it is a play upon this phrase “ set up.” There is no proof that one was ever set down. They are “ set up,” as a missionary station is set up, whether by different societies co-operating, or by a single society. They are set up in the sense that a father sets up his sons in business, or his daughters on marriage. When set up, however, they become their own men and women. When the hive becomes too full, the bees swarm, and the swarm becomes an independent hive. It by no means follows that because one society is set up by the consent and assistance of another society, it is to be dependent upon or subject to the parent society. All the authorities we have on the subject are to the effect that these yearly'meetings are independent organizations, and the highest organizations known or recognized. In the case of Earle v. Wood, above cited, where the evidence, I presume, was substantially the same as here, the court say:
*324 “ The different yearly meetings in America and England? keep up a friendly and fraternal communication with each-other, by means of epistles, visits, and liberating certificates, or general letters of recommendation from one to-another; but there is no subordination acknowledged of one to another, or to all others. . . . Erom this view of the-constitution, organization, and acknowledged usages of the-Quaker body, it appears that the yearly meeting has a final and controlling jurisdiction in all matters of faith and religious duty, of administration and discipline, as well as-of manners and conduct, of all Quakers within its limits. It is final and conclusive, because there is no superior body which can call its decisions in question. It is conclusive-in the sense in which the judgments of the highest courts are conclusive, not because they are necessarily wiser or better than those of other courts, but because it is the tribunal of last resort, and the constitution and laws* have created no tribunal to re-examine its decisions. . . . Each yearly meeting is independent of all others, and different yearly meetings have no other connection than that-which results from Christian fellowship and courtesy.”
Does a society thus organized hold its property by the-frail tenure of the will of other like and co-ordinate societies ? Is a grant to it to inure, at the pleasure of those-other societies, as a grant to them, or to a majority of them ? Can its property be thus taken from an Ohio organization,, and bestowed upon a society in London or Dublin, without' any law or pre-agreement prescribing the terms and conditions on which it may be done ? Shall the title and possession of the property thus be made to change with the changing and capricious will of the majority of the other societies ? Can Plymouth Church of Brooklyn, for instance, be thus compelled, or could its regularly elected officers be compelled, to transfer its church property to the other Congregational churches of New York, or of the world ? The cases are-similar. I presume the church last named took its property, and holds it, as a “ Congregational ” church, just as-, this society took and holds its property as a Quaker church,. *325 <or church “ of the Society of Friends.” In other words, they hoth took and hold their property by their respective proper names — the names which they voluntarily adopted; and for the very good reason that they could take it by no other names. The denominational part of the name of such organizations, as “ Congregational,” “ Baptist,” “ Quaker,” or the like, when applied to societies thus independently organized, is mere matter of description, and not of limitation. Such words are parts of the descriptio persones, and not a covenant as to the exercise of its powders, or the uses of its property. This is abundantly established by authorities. I refer to Smith v. Nelson, 18 Vt. 511; Shannon v. Frost, 3 B. Mon. 253; Watson v. Jones, 13 Wall. 679, and Wiswell v. First Congregational Church of Cincinnati, 14 Ohio St. 31, and cases cited.
It is otherwise where the society is only a branch or member of a superior organization. There the union is organic, vital. The vitality of the branch ceases as soon as it is severed. It has no life but in the life of its superior. A conveyance to it, as such branch, may well imply, and is generally held, though not always (see Smith v. Smith, cited supra), to imply a covenant that it will maintain its vital union 'with the mother organization. It seems •to me that there is a total absence of this organic or vital union among the Quaker societies. .The CongregationalIsts, who are conceded to be strictly independent in their ■organizations, have regulations and laws by which they •can call councils, consisting of delegates representing the various organizations; but no such power or regulation, or even usage, is known among Quakers. Admittedly, no :sucli usage was known at the date of this grant.
“The Ohio Yearly Meeting of the Society of Friends,” .simply means “the Ohio Yearly Meeting of Quakers.” The word “ society ” is here used in the sense of sect or denomination, and not in the sense of organization. It could not be legitimately used iu the latter sense, for there was, •and is, no such organization. The Quakers are a “ society ” in the original sense of the word; they are united *326 in the bonds of friendship and Christian love. They are “ Friends.” They are united in a common belief, but a part of this very belief is, that the yearly meetings have no power over each other. This is a “ union,” but it is a union without ecclesiastical power. Counsel say that the Society of Friends consisted at the outset of a single organization or society. That is true; but it is also true of the Congregationalists, and of all other denominations whose organizations are admittedly independent.
It is argued by counsel, “ that there can be but one Ohio-Yearly Meeting of the Society of Friends.” If by this is meant that both can not be the legitimate successors of the original Ohio Yearly Meeting, I agree to it. But I deny that there can not be two or any number of Ohio Yearly Meetings of the Society of Friends, whether “ set up,” as counsel claim they may be, by the sister societies, or formed by voluntary organization. If this society, at its inception, was “the Ohio Yearly Meeting of the Society of Friends,” and has kept up its regular organization, then it is still the “ Ohio Yearly Meeting of the Society of Friends.”' If it is not, then it has ceased to be itself. I think it is: shown to have kept up its organization, and that Hoyle and his adherents are its regular successors. If a second society is organized by the same name, or is “ set up ” by the sister societies and called by the same name, it by no means follows that the second society extinguishes and supplants-the first one. It has the same name, but it is a different. organization.
Had the society adopted any other name — had they called5 themselves simply “ The Yearly Meeting,” I can not see’ that the case would be in the slightest degree varied from) what it is. They chose, however, naturally enough, for the purpose of further identification, to add words showing that the society was located in “ Ohio,” and that its members were Quakers. Here is no implied covenant in favor of pax-ties from whom they received property by that name, either that they are Quakers, or that they will remains Quakers, much less that they will submit the question of *327 their orthodoxy, or discipline, or the validity of their organization, to the arbitrament of similar and co-ordinate societies. Indeed, there is no question of orthodoxy here, but a mere question of discipline. The real question is, whether Hoyle shall forfeit an office to which he has been regularly elected by the society to which he had belonged for years, and forfeit his membership therein, for no other fault than that which was committed by every society condemning him. He was condemned and disfranchised, or, rather, the society was condemned and excommunicated, for the crime of refusing to acknowledge the validity of a regular election of the New England Yearly Meeting; and every yearly meeting which so condemned him, thereby refused to acknowledge the validity of a regular, and perfectly similar, election of the Ohio Yearly Meeting. In other words, the Gmrneyites established their claims in the New England contest, by procuring from the court an opinion, which is undoubtedly the law, namely, that the entry of the clerk is conclusive of the validity of the election in such cases; and now they have brought a second suit in which they refuse to give the Wilburites the benefit of the law which they have thus established. As I understand it, they have completely changed sides of the question.
Under these circumstances, I say I am quite unwilling to take this property from the defendants and place it virtually in the hands of the other yearly meetings of the world, or of any number of them. The parties in possession have done nothing to forfeit their right thereto. They have kept their original faith and kept up their original organization. They are a majority of the society, and there is no charge against their moral and Christian character, except that they refuse to fellowship with one section of the New England Society, unless fellowship is accorded to both; while their accusers refuse absolutely and unconditionally to fellowship with them.
White, J., concurred substantially in the dissenting opinion of Welch, C. J.