J. S. RANSOM, ET. AL. *v.* WM. ROGERS, ET. AL.

[Abstract Kentucky Law Reporter, Vol. 6—291.]

**Ecclesiastical Controversy.**

Where there is a faction of a Baptist church expelled by the action of the other faction the question of whether it was done in good faith upon the ground of immorality on the part of the excluded members and whether such expulsion was in accordance with the rules governing the church, must be controlled by the organic law of the church and will not be determined by the court, but when the church undertakes to invade the property rights of its members and to exclude them from the use of church property then the church or-

ganization must be treated as any other voluntary association and the courts will protect the rights of property.

**Schisms in a Church.**

Under the act of 1814 "if any schism or division shall take place in the congregation or church for any cause" either of the parties so divided may use the house of worship, the time to be proportioned to the members of each party.

## APPEAL FROM BOONE CIRCUIT COURT.

### October 2, 1884.

OPINION BY JUDGE PRYOR:

This action in equity was instituted by John S. Rogers and others claiming to constitute the entire membership of an organized body of Christians known as the Salem Baptist Church, against the appellees, William M. Rogers and others, for the purpose of determining the right as between these parties to the use of the church property for divine worship. The church property is located near Walton in Boone County and has been used by this body of Christians as a place of worship since the year 1825. It is alleged in the petition that the defendants, the appellees, were at one time members of Salem Church but had been expelled and excluded therefrom for immoral, disorderly and rebellious conduct and were not any of them members of Salem Church at the institution of the action, that the appellees (defendants) had formed themselves into a distinct organization with the defendant Rupard as their minister and pastor, and being so organized had forcibly entered the church edifice and held their meetings against the will and consent of the plaintiffs (appellants) and are claiming not only an interest in the church property but the right to use and occupy it for church purposes and when they constitute no part of or division of Salem Church. They ask that their title be quieted and that the defendants be enjoined from its use.

The appellees for answer say that they are still consistent members of Salem Church adhering to the same creed, faith, doctrine, rules and discipline of that church and have formed no relation with any other church or entered into a distinct or separate organization. They admit the records of the church show their expulsion but aver that the act of their expelling them was not in pursuance

of any authority vested in those expelling them by any rule of the church; that they had not been guilty of any immoral, refractory or disorderly conduct or that they had by force or violence taken possession of the church property. They further pleaded that a schism or division had been created in the church, the plaintiffs constituting one party and the defendants (except Rupard) the other.

That the defendant Rupard is a minister, and had preached occasionally in Salem Church and the plaintiffs being unwilling that he should preach in the church, and defendants desiring he should preach, a separation or schism originated from the disagreement and the appellants (plaintiffs) for that reason withdrew all fellowship with them.

The appellants in response deny that any schism existed in the church or that the church at any time gave to Rupard the right to enter its pulpit although he occasionally preached to that congregation.

It is insisted by counsel for the appellants that the averment as to the existence of a division in the church is insufficient for the reason that the facts constituting the schism must be stated, and upon the pleadings the plaintiffs were entitled to the relief.

The cause of the schism is distinctly averred and the reply places in issue the fact that no division of any kind existed, and if the facts are required to be separately pleaded they could not have been more definitely stated or the issue more certainly made than is presented by the reply to the answer.

The following question arising out of the issues in this case when responded to must determine the rights of the parties to this controversy:

1st. If at the time the appellees were excluded from the church a schism existed in the congregation, does the provision of the General Statutes apply to the property in dispute or is the right of these parties to be determined by the act of 1814 in force at the time the title to this church property was acquired.

2nd. Was the exclusion of the appellees from the church made in good faith upon the ground of immorality on the part of the excluded members, whether there was a valid expulsion of the appellees in accordance with the rules governing the church of which they were members. This court will not assume to determine. The

organic law of the church must control in all such matters and neither this court nor the law-making power can or will undertake to disregard the fundamental principles upon which the church is established. The sovereign power vested in each congregation of the Baptist Church is one of the distinguishing features of that church from all other Christian denominations, each church being a separate and distinct body with sovereignty in the majority to expel the minority for any cause satisfactory to itself as a means of preserving the unity of the church and in the exercise of the authority based on its organic law. The congregation or the particular society will not be disturbed by the legislature or the chancellor. The local society owes no allegiance to any ecclesiastical authority and its connection with other churches, associations or councils are, as we understand, purely voluntary. While all this power is conceded to exist in the church government and to properly belong to it, when the church undertakes to invade the property rights of its members and to exclude them from the use of the church property, then the church organization must be treated as any other voluntary association. This is the well settled doctrine of this court announced in many decisions in reference to such controversies and enforced by reason of the plain letter of the statute.

The Salem Baptist Church was organized in the year 1823 and the land conveyed to the church or its trustees in the year 1827. At that time the act of 1814 was in force. The trustees who then held the title for the church died and for many years it was without any organization and finally re-organized by the appointment of new trustees long after the adoption of the Revised Statutes. The Statute of 1814 authorized the appointment of trustees to hold the title of church property; to bring actions of trespass for an injury to the property and to bring any other actions necessary for its protection. That act also provided "that if any schism or division shall take place in the congregation or church for any cause, then nothing in this act shall be construed so as to authorize said trustees to prevent either of the parties so divided from using the house or houses for worship for the purpose of devotion, a part of the time proportioned to the members of each party." With the further provision "nothing in this act shall be construed to authorize the minority of any church having seceded or been expelled or excommunicated from the church or congregation to interfere in any

manner in their appointment for preaching or worship in any appointment for similar purposes which may have been made by the body or majority of such church or congregation."

If the rights of these parties are to be determined by the act of 1814, it might well be argued that the provisions of that act gave to the appellees a right to use the property in common with the appellants.

The case of *Curd v. Wallace*, 7 Dana (Ky.) 190, where the minority had seceded and subscribed to a different faith and organized a new church this court held that the old church was entitled to the use of the building for its regular appointments, or stated meetings, "to be made in such a manner as to leave to the new church in good faith so much of reasonable time as shall correspond with the ratio of its number of constituent members to that of the elder and now major church." It is true that the judgment in that case was based upon the fact that the church proper had sought the aid of a Court of Equity and not the Seceder's Church, the court intimating that no aid would have been furnished the latter by the chancellor, if they had sought to molest the old church, but the new church would have stood in no better condition than if the act of 1814 had never been passed.

In *Shannon v. Frost*, 3 B. Mon. 253, it was held that excommunicated members of a church to which property had been conveyed had no such interest as would enable them to maintain the action. In that case those leaving the church organized and elected trustees who claimed the right to sue for the property when the old trustees in whom was vested the legal title were still in existence. While that case to some extent conflicts with the case of *Curd v. Wallace, supra;* it is said in *Shannon v. Frost, supra,* that the legislature had the undoubted right to provide that if a church should choose to avail itself of the privilege of supplying new trustees as prescribed in the act of 1814, it would be subject to the conditions expressed in that act and in our opinion it is useless to further discuss the provision of the act of 1814 as the decision in this case must be controlled by the subsequent enactment affecting this question. The trustees named under the original conveyance of this property had been dead for many years before a new organization was effected or before other trustees were appointed or selected by the church. The members of the church were then all beneficiaries

and entitled to its use. The vacancy in the office of trustees had been filled as provided by chapter 13 of the General Statutes. The 4th section of that chapter provides that in case a schism or division shall take place in a society the trustees shall permit each party to use the church and its appurtenances for divine worship a part of the time, proportioned to the members of each party.

The 5th section provides "The excommunication of one party by the other shall not impair such right except it be done bona fide on the ground of immorality. The church at the time or during the existence of these trustees had in all some eighteen or twenty members and from the opinion of the Chancellor below, eight-nineteenths constituted one party and eleven-nineteenths the other. Evidence of the existence of the two parties is found on nearly every page of this large record. The appellees were known as the Rupard party and the appellants as those opposed to his preaching in the church. This trouble in regard to Elder Rupard had impaired the usefulness of the church for years, and when a council was called from other churches for the purpose of determining the matters at issue between them the refusal of the minority to abide by the decision resulted in the expulsion of all who were present, and protesting against the action of the council no charges were made against them of any immoral conduct, but the majority not willing (whether right or wrong is not necessary to inquire) in gratifying the minority in permitting Rupard to preach occasionally in the church and administer the ordinance of baptism, the minority still insisting upon this right, were expelled by the majority and for no other reason. The appellees hold to the same faith and are recognized by other churches, including Elder Rupard, as Presbyterian Baptists. That they may differ in regard to the prescribed views of some of the learned divines of that church as to the proper expunction of the doctrine of regeneration was not the original or the remote cause of their expulsion.

Although this difference of opinion prevails they are still recognized as Presbyterian Baptists and if Rupard's presence had not been denied by the majority the church would have remained undivided. A schism in a church may exist where all the members are of the same religious faith and in that case at least the members of Salem church who had been immersed by Rupard entertain the same faith that Rupard did and the same faith they entertained when

expelled. They stand in the same relation to Salem Church that they did when expelled and if the facts of this case do not bring it within the statutory provisions regulating the rights of property where there are schisms in a church it would be difficult to point out a case where this statute could be made to apply. In *McKinney v. Griggs, &c,* 5 Bush (Ky.) 401, some of the members had seceded forming another organization and committing themselves into another church (The Church North).

In all that class of cases the title to church property was held and controlled by conferees or church judicatures and the questions as to the right to the use of church property made to depend upon the action of these tribunals, who by compromise or otherwise had adjudicated all these differences, by agreeing to a separation and a division of the church property and therefore have no application to this case.

The present statute containing these equitable provisions was enacted to cure the defects and remedy the evil resulting from divisions in churches whereby the rights of minorities are protected in the use of church property. The majority can not impair the right by excluding the party in the minority from the right and privilege of the church unless it be done in good faith on the ground of immorality. There is no pretense that these appellees or any of them were guilty of such vicious or wicked habits as required their expulsion or that they had been guilty of any act inconsistent with the strictest moral rectitude.

The minister that they desired should preach occasionally at their church, was at the time pastor of various Baptist congregations; was a man celebrated for his ability as a teacher of the faith he professed and for his piety and devotion to the church. The mere fact that these appellees opposed the action of the council or differed with the majority or refused to abide by the action of the council is sufficient to authorize their expulsion as a party from the church was not such improper conduct as constituted immorality on their part in the meaning that should be attached to the word as we find it in the statute, it must be such conduct as amounts to dishonesty, wickedness, imposture, such action as contravenes the moral or divine law. If a mere refusal to obey the wishes of the majority or to subscribe to each and every view that the majority may express as to their religious convictions amounts to immorality, the

statute can afford no relief to those whose rights are sought to be protected by its provisions.

The Society of Christians have separated into two parts in regard to matters not affecting the religious views or convictions of either. The minority members entertain the same faith they did when entering the church. They have formed no relation whatever with any other religious denomination and are insisting alone on their right to worship in the church property in the maner provided by the statute. It is clear in this case that there was an explusion of the one party by the other, and that no question or charge of immorality was even intimated at the time their relations with the church were severed by the action of the majority.

We see no reason for reversing the judgment below and the same is now *affirmed.*

*A. G. Winston, O'Hara & Bryan, for appellants.*

*Pryor & Chambers, for appellees.*

[Cited, in *Bennett v. Morgan,* 112 Ky. 512, 23 Ky. L. 1824, 66 S. W. 287.]