Dwenger *et al. v.* Geary *et al.*

Filed Jan. 18, 1888.

———◆———

No. 11,766.

## DWENGER ET AL. *v.* GEARY ET AL.

CEMETERY.—*Purchaser of Burial Privilege.*—*Right Acquired.*—One who buys the privilege of burying his dead in a cemetery acquires no general right of property, but only a right to use the ground as a place of interment, and the rules governing the cemetery in force at the time the privilege is acquired measure the extent of the use.

SAME.—*Catholic Cemetery.*—*Consecrated Ground.*—*Right of Lot-Holder to Inter Non-Catholic Therein.*—Where land is conveyed for use as a burial-place for members of the Catholic Church, and is taken possession of by the proper officers of that religious denomination and consecrated according to the laws of the church, a lot-holder has no right to inter therein any person not recognized by the church authorities as a Catholic.

SAME.—*Injunction.*—*Right of Church Representatives to Maintain.*—Injunction will lie at the suit of the bishop of the diocese and the local priest, who, according to the usages of the church, are vested with control, to restrain the holder of a lot in a Roman Catholic cemetery, which has been con-

secrated for burial purposes according to the laws of that denomination, from interring therein the body of his son, who was not in communion with the church at the time of his death, and who died by his own hand.

SAME.—*Trust.—Death of Trustee.—Control of Property.—Church Laws.*—A trust conferred upon a bishop, or other ecclesiastical functionary, so far as concerns title and ownership of land, is not in itself different from a trust vested in any other natural person, and the death of the trustee vests the trust in the courts; but, regardless of the question of title, church officials who, under the laws of the church and by virtue of their offices, have control of the property, may maintain suits for injunctive relief concerning the same, in proper cases.

From the Tippecanoe Superior Court.

*J. F. McHugh, R. P. Davidson* and *J. C. Davidson,* for appellants.

*J. R. Coffroth, T. A. Stuart, B. W. Langdon* and *T. F. Gaylord,* for appellees.

ELLIOTT, J.—The first paragraph of the complaint of the appellants avers that Joseph J. Dwenger is the bishop of the Roman Catholic Church for the diocese of Fort Wayne, Indiana; that Edwin P. Walters is the pastor of the congregation of the Roman Catholic Church known as St. Mary's, of Lafayette, Indiana, and that the ecclesiastical jurisdiction of Bishop Dwenger embraces the city of Lafayette; that, according to the principles and polity of the Catholic Church, the title and control of all church property are in the bishop of the diocese in which the property is situated, and that he holds it in trust for the congregations and societies of the church, to be by them used and enjoyed according to its principles and polity; that the congregation of St. Mary's holds and enjoys a cemetery, which, for about twenty-five years, has been held and occupied as a place of burial for the deceased members of that congregation, under the control and authority of the bishop of the diocese of Fort Wayne; that the cemetery has been so used exclusively for the interment of those who, at the time of their death, were in regular standing in the church, according to its principles, usages

and doctrines; that, pursuant to those principles, usages and doctrines, a great part of the cemetery has been set apart and consecrated for the burial of the dead, according to the rites, usages and doctrines of the church, and that in such consecrated grounds only Catholics of good standing are allowed sepulture; that part of the cemetery grounds, although held by the congregation of St. Mary's, has not been specially consecrated, but is open to use for the burial of persons not in good standing as Catholics; that, on the 10th day of February, 1884, James Geary died by his own hand, and that his body is now awaiting burial; that John Geary, the father of the deceased, James Geary, owns a lot in the cemetery, and claims a right to there inter the body of his deceased son, and will so inter it unless enjoined; that John Geary has no right to bury his son in the lot owned by him, because, to quote from the complaint, "the cemetery is distinctively consecrated ground, for the burial only of true and faithful Catholics, who die in full communion with the church, and James Geary, at the time of his death, was not a faithful Catholic, in good standing in the church; for, although he may have once been a Catholic, he had, by a wicked and depraved life, and by a failure to observe the doctrines, practices, rules and regulations of the church, and by failing to contribute to its support, and by failing to receive its sacraments, long before lost and forfeited his membership and standing, and had, as he well knew, absolved and released the church from all duty toward and authority over him, and had forfeited his right to be buried in ground consecrated by the church."

It is further alleged that, on the 2d day of February, 1858, Peter Ball and Owen Ball, communicants in good standing of St. Mary's, conveyed the land on which the cemetery was located to John H. Luers, then the bishop of the diocese of Fort Wayne, who took the land in trust as a burying-ground for the Catholics of the city of Lafayette. Immediately after the conveyance to Bishop Luers, the predecessor of Bishop

Dwenger, the congregation of St. Mary's, under the authority of the bishop, and with the co-operation of Peter and Owen Ball, caused the ground to be laid off into lots and platted, and caused it to be set apart and consecrated according to the ritual and principles of the Roman Catholic Church for the burial of the bodies of such persons as were entitled to sepulture according to the rites and doctrines of the church; that the privilege of burying in many of the lots was granted, for a consideration, to members of the church, and a certificate executed to them, but the right so granted was subject to the rules of the church; that, among other requirements necessary to entitle one to interment, it was required that he must have been at his death a member of the church in full communion, and must have performed all of his church duties; that, by the rules and doctrines of the church, a person who committed suicide was not entitled to burial in consecrated ground, and that it was the rule governing the cemetery of St. Mary's, that, before any one could be interred in consecrated ground, a permit must be issued by the pastor of St. Mary's congregation; that a permit was asked by John Geary for the burial of his son in the lot situated in the consecrated ground and was refused. It is also alleged that James Geary, the deceased son of John Geary, was not living in the family of his father, but was living away from his father's home. It is still further alleged that, if the body of the deceased is buried in his father's lot, "it will destroy the character of consecration with which the ground is sacredly invested, and greatly tend to set at naught the authority of the plaintiffs and the discipline of the church."

The deed executed to Bishop Luers by Peter and Owen Ball is set forth, and so far as its provisions are material they are as follows: "By this deed Peter Ball and his wife, Charlotte B. Ball, and Owen Ball and his wife, Frances A. Ball, convey and warrant to the Rt. Rev. John H. Luers, bishop of Fort Wayne, in trust for the Catholics of Lafayette, part of the southwest quarter of section thirty-one, township

twenty-three north, of range four west. It being hereby expressly understood and reserved that said land is to be used as and for a cemetery for said Catholics."

The second paragraph of the complaint sets forth the deed from Peter and Owen Ball, and contains allegations on the subject of the authority and duty of priest and bishop very similar to those of the first paragraph, and it also makes similar allegations concerning the polity of the church, concerning the laying out and consecration of the cemetery, concerning the life and conduct of James Geary, and concerning the rules of the cemetery. In addition to these allegations, it is averred that, for the purpose of more effectually transferring and confirming in his successor the legal title of all property held by him as bishop, John H. Luers, on the 11th day of May, 1864, executed a will wherein he devised the property to Archbishop Purcell and Bishop Spalding, with directions to them to convey it to his successor in the office of bishop of Fort Wayne; that conveyances were subsequently executed, as directed by the will of Bishop Luers, to Bishop Dwenger; that, after Bishop Dwenger acquired title, he took possession of the cemetery by virtue of his ecclesiastical powers and the conveyances executed to him; that possession was taken by him in April, 1872, and on the 8th day of May, 1874, he, by his agents, sold a lot to Michael and John Geary and executed to them a receipt for the money paid for it, but executed no conveyance in any form, and that it is on this lot that John Geary threatens to inter the body of his deceased son.

The relief sought is an injunction preventing the burial of the remains of James Geary on the lot bought by Michael and John Geary.

If the controlling question which comes to us for judgment were one affecting only ordinary property rights, and concerning only ordinary property, we should have very little difficulty in determining the controversy. If the controversy must be determined upon the words of the deed of

Owen and Peter Ball, and all the acts of the parties under it and the attendant circumstances excluded from consideration, then it would necessarily result that the plaintiffs can not maintain this suit. If the controversy is confined to that deed and subsequent conveyances, to the exclusion of extrinsic matters, there is no right of property in the plaintiffs which will enable them to enjoin the threatened wrongful act of the defendants. If the whole interest of the plaintiffs depends upon the conveyances considered in themselves and without reference to other facts, they must be adjudged to have neither the legal nor the equitable title. The deed to Bishop Luers did not, in itself, empower him to nominate his successor in the trust. Nor, if the case be considered as involving only ordinary property rights, and as depending solely on the terms of the deed, can it be held that the conveyances invested the Catholic Church or its representatives with authority to appoint a trustee. When Bishop Luers died mere property rights vested in him did not pass to his ecclesiastical successor, nor to successors nominated in his will or by his devisees. Our authority for this conclusion is the statutory provision which reads thus: "Upon the death of a sole or surviving trustee of an express trust, the same shall vest in the court having jurisdiction thereof; and such court shall forthwith appoint a successor, in whom the trust shall vest." R. S. 1881, section 2978.

The ecclesiastical office held by the bishop of Fort Wayne is not of such a character as to clothe it with corporate attributes. In no sense is the office a corporation. There is, therefore, no perpetual succession. A trust conferred upon a bishop or other ecclesiastical functionary, so far as concerns title and ownership of land, is, in itself, not different from a trust vested in any other natural person. The death of a bishop who simply holds lands in trust, like that of any other individual who occupies the position of a trustee, vests the trust in the courts. If a successor in the trust is desired, appeal must be made to the proper court for his appointment.

This is so whether the individual be an ecclesiastical functionary of the highest rank or a layman of the humblest degree.

It is because the central question which comes to us goes beyond ordinary property rights that we find the case one of great difficulty. There is something more than a dispute as to who, under the terms of the deed of Owen and Peter Ball, holds the title to the land used as a cemetery by the Catholics of Lafayette. The case does not, indeed, necessarily involve the question of title at all. The controversy is not as to who owns the ground, but as to who may be buried there, and how and by whom that question shall be settled. Two great questions are presented, and they are these:

*First.* Had John Geary a right to bury his deceased son in the consecrated ground of St. Mary's cemetery?

*Second.* If John Geary had no such right, can these plaintiffs maintain a suit to enjoin him from interring the body of his son in that ground?

Of these in their order.

*First.* The sepulture of the dead has, in all ages of the world, been regarded as a religious rite. The place where the dead are deposited all civilized nations, and many barbarous ones, regard, in some measure at least, as consecrated ground. In the old Saxon tongue the burial-ground of the dead was "God's acre." One who buys the privilege of burying his dead kinsmen or friends in a cemetery acquires no general right of property. He acquires only the right to bury the dead, for he may not use the ground for any other purpose than such as is connected with the right of sepulture. Beyond this his title does not extend. He does not acquire, in the strict sense, an ownership of the ground; all that he does acquire is a right to use the ground as a burial-place. In discussing this subject it was said by the court, in *Page* v. *Symonds*, 63 N. H. 17 (56 Am. R. 481): "Such right of burial is not an absolute right of property, but a privilege or license to be enjoyed so long as the place continues to be

used as a burial-ground, subject to municipal regulation and control, and legally revocable whenever the public necessity requires. It is a right of limited use, for purposes of interment, which gives no title to the land. *Craig* v. *First Presbyterian Church*, 88 Pa. St. 42 (32 Am. R. 417); *Windt* v. *German Reformed Church*, 4 Sandf. Ch. 471. A grant of a lot in a cemetery is said to be analogous to a grant of a pew in a meeting-house, and the right of burial in a public burying-ground in some respects resembles the right of pew tenancy. *Jones* v. *Towne*, 58 N. H. 462 (42 Am. R. 602); *Sohier* v. *Trinity Church*, 109 Mass. 1 (21); *Kincaid's Appeal*, 66 Pa. St. 411 (5 Am. R. 377)." To the cases cited in the opinion from which we have quoted, may be added *Richards* v. *Northwest Protestant Dutch Church*, 32 Barb. 42, and *The Matter of Brick Presbyterian Church*, 3 Edw. Ch. Rep. 155.

It may, therefore, be safely affirmed that John Geary secured nothing more than the privilege of using the lot set apart to him as a burial-place, for, so far, there is neither doubt nor difficulty.

The privilege of burial which John Geary secured was not a general one, since, by the express words of the deed by which the ground was set apart for a cemetery, its use for a burial-place was restricted to Catholics. There was in the deed itself a clear and positive limitation to a class, and the courts can not be in doubt as to the class intended by the parties to the deed. It can not be unknown to any court that the term " Catholics," when employed by Catholic grantors, as it was here, in a deed to a high officer of a great and powerful church that has existed for many centuries, means members of the Catholic Church, whose ecclesiastical head is the Pope. We can not, therefore, doubt that only Catholics had the right of interment in the cemetery of St. Mary's, even if we confined our view to the words of the deed. But it is not to be so confined. We must look to the acts of

the parties. Long prior to the time John Geary obtained his lot the officers of the church had taken possession of the ground, and with the solemn rites of the church consecrated it as a burial-place for Catholics in full communion with the church. The deed was executed in 1858, and immediately afterwards the ground was taken in charge by the bishop of Fort Wayne in virtue of his office, and he, in conjunction with the grantors and the congregation of St. Mary's, laid it off into lots, platted it, and consecrated it as the law of the church prescribed.

For more than sixteen years before John Geary obtained his lot the ground had been under dominion of the church officials and used as a burial-place for those who, by the rules of the church, were Catholics. When John Geary obtained the lot he acknowledged the right of the church, for he bought from its representative, and he knew, as a member of that church, that only Catholics had, for all the years that the cemetery had been established, been allowed to be buried in the ground consecrated for the burial of faithful Catholics by the priest and bishop of the church. It seems clear to us that he obtained no more than a privilege to bury a Catholic in the ground so solemnly set apart for the sepulture of Catholics in good standing. Certainly, he acquired no right to disturb the peace and security of those whose kinsmen had long been buried, by placing in consecrated ground the remains of one who, under the laws of the church, had no right to sepulture. He acquired a right to bury there a Catholic, and none other, for the cemetery was established by Catholics for Catholics, was used for the burial of Catholics, and was consecrated to that purpose when it first became a place for the burial of the dead. All this occurred long before he acquired the semblance of a right. We can not conceive upon what principle of right or justice he can be allowed to disturb the peace and wound the feelings of those who conscientiously believe that none save those of their own faith shall be buried in the ground consecrated by

their church. He is the latest in time and the weakest in equity, and justice forbids that he should be permitted to disturb the order of things existing when he acquired the privilege of using the cemetery as a burial-place. He, indeed, acquiesced long after he obtained this privilege, for not until 1884 did he demand a right to inter any person in the cemetery not recognized by the church as a Catholic.

For more than a quarter of a century the Catholics of St. Mary's had, so far as the record shows, used the cemetery as they believed it should be used, and that use ought not to be broken or disturbed except upon the strongest reasons. John Geary presents no such reasons. He acquired his rights as a Catholic in a cemetery set apart by Catholics to Catholics, and acquired them long after the character of the cemetery had been established by church authority and by usage, and he has not the slightest claim in justice or equity to disregard that usage, and bury in the cemetery one whom the laws of the church and the usage of the owners and rulers of the cemetery declare shall not lie there.

No power save that of the church can rightfully declare who is a Catholic. The question is purely one of church government and discipline, and must be determined by the proper ecclesiastical authorities. *White Lick Quarterly Meeting, etc.,* v. *White Lick Quarterly Meeting, etc.,* 89 Ind. 136.

In discussing this subject, it was said by the court in *Smith* v. *Nelson,* 18 Vt. 511 : " The court, having no ecclesiastical jurisdiction, can not revise or question ordinary acts of church discipline. Our only judicial power in the case arises from the conflicting claims of the parties to the church property and the use of it. We can not decide who ought to be members of the church, nor whether the excommunicated have been justly or unjustly, regularly or irregularly, cut off from the body of the church."

The decisions of the church authorities are final. The rule upon this subject is thus stated in the case of *German Reformed Church* v. *Seibert,* 3 Pa. St. 282 : " The decisions of

ecclesiastical courts, like every other judicial tribunal, are final; as they are the best judges of what constitutes an offence against the word of God and the discipline of the church. Any other than those courts must be incompetent judges of matters of faith, discipline and doctrine; and civil courts, if they should be so unwise as to attempt to supervise their judgments on matters which come within their jurisdiction, would only involve themselves in a sea of uncertainty and doubt, which would do anything but improve either religion or good morals."

Under the discipline and doctrines of the church, as enforced by the functionaries invested with the power and duty of deciding questions of doctrine and discipline, James Geary was not a Catholic, and this decision is final and conclusive. As he was not a Catholic, his father had no right to inter his body in St. Mary's cemetery. Thus we dispose of the first of the questions stated by us.

*Second.* In determining what the answer to the second of the questions stated by us shall be, it is necessary at the outset to recur to the character of the right secured by John Geary, and the nature of the purpose for which, in the contemplation of all the parties, the right might be exercised. As we have said, the burial of the dead is essentially a religious rite. The interment of the bodies of the dead is, therefore, a matter which, within limits, may be with entire propriety brought within ecclesiastical jurisdiction. To be sure, the ecclesiastical jurisdiction can not restrict the police power of the State, but it may prescribe rules for the government of a cemetery, where those in interest place the cemetery under its authority. In exercising jurisdiction over burial-places the ecclesiastical authorities do not, unless they transcend their jurisdiction, usurp police powers nor determine questions affecting property rights. A religious organization, in assuming control of a cemetery, does not assume jurisdiction of secular matters, and, therefore, does not wander outside of its domain into the domain of the civil law. It is

only when it transcends its jurisdiction by arrogating to itself powers that belong to the civil government that its acts can be condemned by the courts. It does not exceed its jurisdiction in assuming to establish rules for the interment of the dead, unless those rules contravene some rule or principle of jurisprudence. We affirm, therefore, that a religious denomination may, when solicited by the parties in interest, assume jurisdiction over cemeteries and prescribe rules for their government, but can not establish any rules, that contravene any principle of law.

We suppose that any organization, religious or secular, may control the right of burial, and declare who shall possess it. It is perhaps true that the right to determine who shall be entitled to the privilege of sepulture can not be exercised in a case where it would encroach upon rights previously acquired, but it may be exercised prior to the acquisition of such rights, and those who obtain privileges after the right is exercised by the declaration of appropriate rules take under those rules.

Where a cemetery is placed under the charge of a religious organization (and, as the right of burial is in its nature a religious one, it may be placed under the control of such an organization), one who secures the privilege of burial after this has been done, and after rules have been established, takes his privilege under the rules so established. To hold otherwise would leave every possessor of a privilege to do as he liked, and inter whom he pleased, however much his act might disturb the peace and disquiet the consciences of others. The declaration of rules is, it is readily perceived, essential to the government of a cemetery placed under the dominion of a religious denomination, and the power to declare them must be lodged in some person or persons. Under the confessed allegations of the complaint, this power is lodged in the bishop of Fort Wayne and the pastor of St. Mary's. What was said by the court in the case of *People* v. *Trustees*, 21 Hun, 184, in discussing a case very like the present, ap-

plies here, and we quote it: " What then are the surround-
ing circumstances of the present case ? Clearly the rules, re-
lations and customs of the defendant with regard to burials
in its cemetery. Every applicant is presumed to know, that
it is not an ordinary cemetery, incorporated and conducted
for the purpose of general and indiscriminate burial, but a
corporation attached to the Roman Catholic Church, with
power to make lawful rules, regulations and by-laws. In fact,
that the cemetery is part of the temporalities of this great
church. It is in evidence, *without dispute,* that under the rules
and usages applicable to the cemetery in question, the burial
of non-Catholics or of Freemasons is forbidden, and that
such right is reserved exclusively for Roman Catholics dying
in communion with the church. It also appears that the
cemetery was duly consecrated by appropriate rites and cere-
monies, that the trustees are members of the church, spirit-
ually subject to its laws, usages and discipline, and, in sub-
stance, that the business affairs of the cemetery were and are
being conducted in good faith by these trustees to give effect
to such laws, usages and discipline. In the absence of any
special contract, excluding this *status* by the omission of a
restriction in a formal deed or agreement, the presumption is
a just and reasonable one, that such *status* was a part of the
transaction, and that the laws and usages, to which we have
referred, were understood by both parties as lying at the very
root of the negotiation and pervading it throughout.

" Where a party applies for a burial plot, at the office of a
distinctively Roman Catholic cemetery, it is with the tacit
understanding that he is either a Roman Catholic, and as such
eligible to burial, or at least that he applies on behalf of
those who are in communion with the church. The entire
business is transacted on that basis. The parties may, not-
withstanding, contract, if they choose, in such a manner that
any one, even a Buddhist, Mohammedan, or avowed atheist,
will have a legal right to sepulture in the plot; and the law
will give effect to their bargain. But to accomplish such an

object, to contract in entire disregard of the church laws, usages and customs applicable to the cemetery, to give the vendee an absolute right to disturb what is believed to be the spiritual harmony of the surroundings, a very different instrument from this simple receipt would have to be secured. We might go further, and say that such an instrument, to be of any validity, should emanate from some one duly authorized to make a contract, so unusual and contrary to the spirit of the institution. It might well be doubted whether the superintendent of the 'cemetery office' could confer such a right under his ordinary power, which seems to be limited to the issuing of receipts similar to that under consideration. *Adriance* v. *Roome,* 52 Barb. 399; *Dabney* v. *Stevens,* 10 Abb. Pr. N. S. 39."

Our own court has very fully and explicitly affirmed the doctrine that property held under church laws may be controlled by church officials. This was so declared in the case of the occupancy of real estate by a priest of the Roman Catholic Church, and it was adjudged that, in so holding, the priest was in possession as a servant and not as a tenant. It was still further adjudged that the bishop of the diocese, under the laws of the church and by virtue of his ecclesiastical office, might maintain an action to oust the occupant. *Chatard* v. *O'Donovan,* 80 Ind. 20 (41 Am. Rep. 782).

It is true that the decision of the New York court, to which we have referred, was made in a case where the cemetery was owned by a corporation, but this does not affect the validity of the reasoning nor diminish the force of the decision, for it can make no difference by whom the rules were made if there was rightful authority to make them. An association of persons, whether incorporated or not, may unquestionably make regulations governing the use of privileges in property owned by them. They may make these rules themselves, or they may delegate that power to others. Here there was a delegation of power to the pastor of St. Mary's and the bishop of Fort Wayne by the acts of the parties in

interest and the laws of the church. These ecclesiastical functionaries were invested not only with authority to make rules, but they were also invested with full control over the cemetery. Everything was committed to them. As this is so, it must follow that they may vindicate the rights vested in them.

The Catholics of Lafayette have abdicated power, even if it be conceded that they ever possessed it, over the cemetery, and vested it to the amplest extent in the priest and bishop. This was the condition when John Geary acquired his burial privilege from the church officials, and he can not question their authority to maintain a suit to enforce the rules they had plenary authority to make, and which were made in a matter over which they undeniably had absolute control. Not only had this control been long exercised and yielded to with unquestioning obedience by others, but he, himself, by securing the privilege from them, acknowledged their authority. But it can not be conceded that the individual Catholics of Lafayette ever possessed authority over the ground, for, from the moment it was consecrated as a Catholic burial-ground, it came under the dominion of the church. It became so by the laws of the church, to which all Catholics, as Catholics, yield, and to which the individual Catholics in this instance did in fact yield. But, had there been no actual surrender to the church authorities, the burial-ground, under the laws of the church, became subject to the control of the representatives of the church when it was consecrated as a Catholic cemetery. Accepting, as the Catholics of Lafayette did in 1858, the consecration of the ground under the rites and ceremonies of the church, they constructively placed it under ecclesiastical jurisdiction, even if they had not done so in fact. If it did pass under the dominion of the church, and if the pastor of St. Mary's and the bishop of Fort Wayne represent the church, then they control the cemetery, and may prosecute suits when necessary to invoke relief from the law of the land. If the laws of the church vested, as they

did, full authority and dominion over the cemetery in these church officials, they may sue whenever there is an invasion of the rights vested in them.

It seems clear on principle, that where, as here, land is conveyed to be used as a burial-place by members of a religious denomination, and immediately after the execution of the deed possession and control are assumed by the proper officers of the religious organization, and they, by the ordained rites of the church, dedicate the ground as a church burial-place, the cemetery passes under the dominion of the church, although it is not conveyed to it in trust, and there is no corporation. Mr. High thus states the rule: "It is not necessary that property should have actually been conveyed to the uses of a religious society to create a trust entitled to the protection of equity, and where real estate has been dedicated to religious uses and has been held and occupied by a church for religious purposes and as a burial-ground for a period of fifty years, with the acquiescence of the original donor, his heirs will be enjoined from disturbing such possession and from attempting to regain the property. And although the congregation is a mere voluntary society, never incorporated, and acting by committees or trustees chosen from time to time by the vote of the members, such trustees, being in actual possession of the premises and acting by direction of the society to prevent any disturbance of that possession, are proper parties to maintain a bill for injunction." 1 High Injunction, section 316. The author follows the decision in *Beatty* v. *Kurtz,* 2 Peters (U. S.), 566, where Judge Story, as the representative of the court, delivered an able opinion, holding that, although a Lutheran congregation was not incorporated, trustees chosen by its members might maintain a suit for an injunction, and that this they might do although the property was never conveyed to the congregation or to any of its members, either in trust or otherwise. The case before us is very much stronger than the one to which we have referred, for here there was a conveyance, for the purpose of

a cemetery, to members of a religious society, and the grant-
ors, in conjunction with the other parties in interest, in the
most solemn manner dedicated the ground as a burial-place
for Catholics. . Not only was this done, but the ground was
at once placed under the dominion of the church, and by its
officials consecrated as a cemetery for the use of members in
good standing, thus, by the laws of the church as well as by
the acts of the parties in interest, placing it in the possession
and control of the priest and bishop.    These officers, there-
fore, derive their right to sue from two sources, the laws of
the church and the appointment of the parties.

By acts extending over a period of many years, and begin-
ning immediately after the deed was executed, the parties
have given a construction to that instrument.    The earliest
acts were unequivocal, and throughout the years that inter-
vened between 1858 and 1884, the practical construction
placed upon the instrument was acquiesced in by all interested
in the cemetery.    The years of possession and usage are in
numbers enough to give title under the statute of limitations.

In ordinary cases the rule is, that a practical construction
given to a contract will be adopted by the courts as the cor-
rect one.    *Johnson* v. *Gibson,* 78 Ind. 282; *Reissner* v. *Oxley,*
80 Ind. 580; *Willcuts* v. *Northwestern M. L. Ins. Co.,* 81
Ind. 300 ; *City of Chicago* v. *Sheldon,* 9 Wall. 50.

Seldom is a case so strong as the present.    The practical
construction has been uniform, long continued, and evidenced
by the most solemn acts.    There can be no doubt that, under
the operation of this rule, the deed as construed by the parties
made the cemetery a Catholic cemetery, and brought it under
the laws of the church.    If this be true, then it can not be
doubted that these plaintiffs have a right to maintain this
suit.

It is not to be forgotten that John Geary holds his privi-
lege from the officers of the church, and that he has never
received any conveyance.    The only instrument executed was
a receipt for money ; this, and nothing more, does he hold in

the form of a written evidence of title. It is clear, therefore, that he is a mere licensee. All he has is a license, and that he holds from the church. This license conveys no interest in the land; it does no more than confer a privilege. To this extent it goes, no further. 3 Kent Com. 452 ; *Kincaid's Appeal, supra ; Partridge* v. *First Independent Church, etc.,* 39 Md. 631.

All that he acquired was a privilege to use the cemetery for the purpose to which it was dedicated, and the rules in force when he acquired that privilege measure the extent of that use. The laws of the church, under whose control the cemetery had been from the earliest years of its existence, vested possession and control in the priest and bishop as the representatives of the church, and, as such, they may rightfully invoke the assistance of the courts to prevent a licensee from doing what the laws of his church forbid him from doing, under the privilege granted to him as the licensee of the church.

In deciding that John Geary had no right to inter the body of his dead son in the lot held under the license from the church, and that the plaintiffs had, at the time the suit was begun, a right to maintain it, we effectually dispose of all the questions in the case, whatever form they assume. If, at the time the suit was commenced, there was an existing right of action in the plaintiffs, it was error to sustain the demurrer to their complaint.

Judgment reversed.

Filed Jan. 18, 1888.