## DETERMINED IN THE

# FIRST DEPARTMENT

### AT

# GENERAL TERM,

## November, 1889.

PHILIP McGUIRE, as Administrator, etc., of JOHN McGUIRE, Deceased, Appellant, v. THE TRUSTEES OF ST. PATRICK'S CATHEDRAL, in the City of New York, Respondents.

*Interment in a cemetery — the right thereto is a mere license and not an easement — the burial therein, of the wife of the party acquiring such license, is not a part performance — the party to be buried must be in communion with the church owning the cemetery.*

54  207
82  135

In an action, brought to secure the interment of the remains of the plaintiff's intestate in Calvary Cemetery, Queens county, in the State of New York, it appeared that the cemetery was acquired and controlled by the defendant, under statutory authority; that the intestate, in his lifetime, upon the payment of ten dollars, received from the officer of the defendant· the following receipt and agreement:

"No. 726.       "CALVARY CEMETERY,
          "NEW YORK, *Nov.* 22, 1870.
  "266 Mulberry street.

  "Received from John McGuire ten dollars, being the amount of purchase-money of a grave two feet by eight in Calvary Cemetery, with privilege to erect a head-stone thereon.
                "D. BRENNAN,
          "*Supt. of Office of Calvary Cemetery.*
  "Grave 9, Plot F, Section 8, Range 56."

Prior to the death of the intestate the grave referred to in this statement was actually located, and the remains of his wife were interred therein. The grave was sufficient in capacity for the interment of more than two dead bodies.

Upon the trial of an action to compel the defendant to permit the interment of his intestate in this plot of ground:

*Held,* that the plaintiff's intestate had no grant, and consequently no easement in the premises.

That the right acquired under the agreement above set forth was a license only and revocable, and could not be specifically enforced, and that the plaintiff had no property rights which would authorize a court of equity to grant him the relief sought.

*Wiseman* v. *Lucksinger* (84 N. Y., 38); *Cronkhite* v. *Cronkhite* (94 id., 323) followed.

That the act of permitting the body of the wife of the plaintiff's intestate to be buried in this plot of land, no money having been expended by the intestate upon her grave, was, in no proper sense, an act of part performance, but was simply a partial enjoyment of the privilege.

It was conceded, on the trial, that the cemetery lands were consecrated with religious ceremonies by the Roman Catholic Church for the exclusive purpose of the burial of the remains of persons who might die in communion with that church. The plaintiff's intestate, when he received the receipt, was a Roman Catholic.

*Held,* that any contract, which might be implied from the circumstances of this case, must be considered as made for burial in land consecrated for the exclusive purpose of the burial of the remains of persons who might die in communion with the church from which said burial rights were obtained, and that the question as to whether the party to be buried therein was in communion with that church was one over which the church itself had exclusive jurisdiction. (DANIELS, J., dissenting.)

APPEAL by the plaintiff from a judgment rendered at a Special Term held in the county of New York, and entered in the office of the clerk of that county on January 22, 1889.

The action was brought to obtain a judgment requiring the defendants to open a grave in Calvary Cemetery, or to permit the same to be opened by the plaintiff, and to permit the interment of the body of the plaintiff's intestate therein, and that the defendants, their agents and servants be enjoined from interfering with such burial, and that the plaintiff recover from the defendant the sum of $1,000 damages.

The action has been brought to secure the interment of the remains of John McGuire, deceased, in Calvary Cemetery, Queens county, in the State of New York. The cemetery was acquired and controlled by the defendants under an act of the legislature conferring that power upon the trustees of St. Patrick's Cathedral. The intestate died on the 19th of February, 1888, and an application was made for his interment in the cemetery, which was refused by the trustees, under the direction of the clerical authorities of the

Catholic church. In his lifetime the intestate, for the sum of money mentioned in it, received the following receipt and agreement:

"No. 726. "Calvary Cemetery,  
"New York, *Nov.* 22, 1870.

"266 Mulberry street.

"Received from John McGuire, ten dollars, being the amount of purchase-money of a grave two feet by eight in Calvary Cemetery, with privilege to erect a head-stone thereon.

"D. BRENNAN,  
"*Supt. of Office of Calvary Cemetery.*

"Grave 9, Plot F, Section 8, Range 56."

And prior to his own decease the grave mentioned in the instrument was actually located, and the remains of his wife were interred therein. The grave, as it was located, was sufficient in capacity for the interment of more than two dead bodies, and the object of the action, as well as of the application to the authorities controlling the cemetery, was to secure the interment of the remains of the intestate in the same grave.

*John H. Post,* for the appellant.

*George Bliss,* for the respondents.

BARRETT, J.:

I am unable to concur in the conclusion arrived at by Mr. Justice DANIELS in this case. The learned judge ignores the views which were expressed by this court in the *Coppers Case* (21 Hun, 184). In that case a receipt similar to the present, but more favorable to the holder's contention, was fully considered and its inadequacy to confer a legal and enforceable right pointed out. The question there was, whether a *mandamus* would lie. Incidentally we held that it was " even doubtful whether equity would decree a specific performance." Upon that question a definite opinion was reserved. It was enough for the denial of the *mandamus* that the right, if any existed, was an equitable one, and as such could not be enforced at law. We endeavored to show that there was absolutely no legal right and that an equitable right was extremely doubtful. This latter question is now before us for a decided and definite opinion.

To its accurate solution a clear statement of the precise facts is essential. Let us, for the moment, assume that burial has been arbitrarily refused. Thus, it is said, McGuire has been denied his "property rights." What, then, are these property rights? They rest exclusively upon the receipt given *in extenso* in Mr. Justice DANIEL's opinion. There is not a particle of evidence in the case of any parol agreement except such as may be implied from the possession of that paper. What took place between the parties when Mr. John McGuire paid the ten dollars, specified in the receipt, to Mr. D. Brennan, the "Superintendent of the office of Calvary Cemetery," we know not. What their bargain was is entirely undisclosed. Whether it was a bargain for the burial of one person, or of two or more persons, for the burial of McGuire himself, of his family, of both, or of Catholics outside of his family, are all mere matters of conjecture. What we know is, that, as the result of some undisclosed parol agreement, Brennan gave McGuire a receipt for ten dollars, specifying that such sum was the "amount of purchase-money *of a grave*," the location of which is indicated by some words and figures which appear beneath Mr. Brennan's signature. I have said that the receipt in the Coppers case was more favorable than this to the holder's contention, for there it read "amount of purchase-money *of a plot of ground* eight feet by eight feet." That receipt was also more complete and specific, in that it *particularized and numbered the graves* for which the plot of ground should be utilized. I quote the form of this enumeration : "4 graves, 5, 6, 7, 8." Here we have nothing of the kind. There is proof in the case that the located grave would hold four bodies and perhaps even more ; but who shall say that the parties contemplated packing the earth (two feet by eight) in such an extremely economical fashion? Is it to be implied from a receipt for the purchase-money *of a grave* — that receipt standing alone and without a scintilla of evidence tending to pluralize the expression? I cannot think it. Now, upon these facts, what, in law, were Mr. McGuire's precise property rights? Were they such as can be specifically enforced by his administrator in a court of equity? That is the real question. Now, in the first place, it is very clear that the right of burial is either an easement or a license. If an easement, it is an interest in the land. If a license, it is not. In the former case the right is

permanent. In the latter it is personal and revocable. There are some subtle suggestions in the old cases with regard to irrevocable licenses founded upon good consideration. It seems to me, however, that when we talk of an irrevocable license, founded upon a good consideration, we simply run into the domain of easements. However that may be, it is not claimed that McGuire here acquired an easement; nor, indeed, could such a claim be defended, for the simple and sufficient reason that there was no grant. The learned counsel for the plaintiff rests his claim upon the purchase of a license or privilege, which he contends was irrevocable, and enforceable by bill for specific performance.

If, however, McGuire acquired no interest in the land, as is fully conceded in the appellant's second point, and as is unquestionably the law, it is difficult to see what basis there can be for a decree *that the land be perpetually burdened.* If the plaintiff proceeds as the successor of a mere licensee, he is met by the principle of revocation and also by the rule that courts of equity will not specifically enforce such privileges. Mr. Pomeroy, in his work on Specific Performance (§ 132) says, that "in certain States a parol license to enter upon and occupy land of the licensor, and to do acts thereon, if partly executed by the licensee so that injury which is technically called irreparable would be caused by its revocation, will be specifically enforced. * * * This rule is undoubtedly opposed to the common-law doctrine concerning licenses as it prevails in England and in most of the American States." In a note to this section it is said that the proposition stated in the text is most strongly maintained by decisions of the Pennsylvania courts. These Pennsylvania cases (notably *Rerick* v. *Kern*, 14 Serg. & Rawle, 267) were considered by Duer, J., in *Jamieson* v. *Millemann* (3 Duer, 255). That learned judge said: "It cannot, however, be denied that the Supreme Court of Pennsylvania, in the cases to which we were referred, has held that a parol license may, in special cases, have the full operation of a grant; but the decisions in Pennsylvania stand alone, and will be found, upon examination, to proceed upon a doctrine which is peculiar to the courts of that State," * * * "as evidence of the law that we are bound to administer, they have no authority whatever." Judge Duer also points out the distinction between an executed license

the effect of which is merely to suspend the enjoyment of an easement (as in *Winter* v. *Brockwell*, 8 East, 308) and a license warranting acts *to be done by the licensee upon the lands of the licensor*. In the former case the doctrine is nothing more than that, by a parol license without a deed, the enjoyment of an easement may be waived or extinguished. This doctrine of *Winter* v. *Brockwell* (and, also, of *Moore* v. *Rawson*, 3 B. & C., 332, and *Liggins* v. *Inge*, 7 Bing., 682) is said to be wholly inapplicable when "the effect of holding the license to be irrevocable would be to give to the licensee a permanent interest or easement in these lands of the licensor;" and the learned judge adds, that this has been "determined in numerous cases in the English courts, in those of our sister States, *and emphatically in our own*." (See the cases cited by Judge DUER in support of this latter statement, page 260, to which I add *Wolfe* v. *Frost*, 4 Sandf. Ch., 73.) As Chief Justice SAVAGE said, in *Mumford* v. *Whitney* (15 Wend., 393): "To decide that a right to a permanent occupation of the plaintiff's land may be acquired by parol, and by calling the agreement a license, would be, in effect, to repeal the statute."

It follows that as plaintiff has no grant, and consequently no easement, and as his license is revocable and cannot be specifically enforced, he has no property rights whatever which will authorize a court of equity to grant him the extraordinary remedy of a mandatory decree. The question remains, whether a case has been made out for a specific performance *of a parol agreement for the grant of an easement*. In *Wiseman* v. *Lucksinger* (84 N. Y., 38), this question was considered upon facts somewhat analogous to those now before us. The court first discussed the claim of license, holding that "a right of drainage through the lands of another is an easement requiring for its enjoyment an interest in such lands which cannot be conferred by parol license; it can only be granted by deed or conveyance in writing."

The head note disposes of the question of consideration in these words: "A mere license to drain is not made irrevocable by the fact that a valuable consideration was paid therefor."

In answer to the remaining contention, namely, that courts of equity would give effect to parol agreements for the grant of easements, when founded upon a valuable consideration, DANFORTH, J.,

observed that " the contract which equity will regard as equivalent
to the grant required at common law or by the statute must be a
*complete* and sufficient contract, founded not only on a valuable
consideration, but its terms *defined by satisfactory proof*, and
accompanied by acts of part performance unequivocally referable
to the supposed agreement;" and, again: " There are, no doubt,
many cases in which courts recognize an equitable right to an
easement without a deed; but there will be found in them either
*an express agreement for an* easement, or an acquiescence or con-
sent by conduct which has led to the *erecting of permanent works,
or valuable and lasting improvements*, or some other fact which
would make the assertion of a legal title operate *as a fraud* upon
the persons setting up the equitable right."

The doctrine of this case was reaffirmed in *Cronkhite* v. *Cronk-
hite* (94 N. Y., 323.) Miller, J., repeated the language of Dan-
forth, J., which I have quoted, and he referred to the facts of the
former case in these words : " In the case of *Wiseman* v. *Lucksinger*
(84 N. Y., 31 ; 38 Am. Rep., 479) the plaintiff had paid a sum
of money for permission to drain his lot upon the land of the
defendant, and took a receipt for the same, and he used and enjoyed
the privilege for twenty-five years when the defendant revoked
the permission. In an action to enforce the right of the plaintiff,
it was held * * * that the right to drain was an easement
which could not be conferred by parol license, but could be granted
only by deed or conveyance in writing, and that an oral contract,
which equity will regard as equivalent to the grant required at com-
mon law or by statute, must, as already stated, be *a complete* and
sufficient contract *in all its parts*." These cases were referred to
with approval, and cited in support of like propositions, in *Duryee* v.
*Mayor* (96 N. Y., 484) and *Fargis* v. *Walton* (107 id., 403).
It is apparent from the statement of facts with which I have prefaced
these legal considerations, that the present case, treated even as a
bill for the specific performance of a parol agreement for the grant
of an easement, falls far short of what is required by the principles
enunciated in these authorities. In all of the cases there was at
least some oral testimony in support of the parol agreement. It
was not left entirely to the implications deducible from a mere
receipt for money. Thus, in *Wiseman* v. *Lucksinger* (*supra*), the

plaintiff testified to the parol agreement (page 43), and the defendant denied the receipt of the alleged consideration. The plaintiff also proved the loss of a receipt, said to have been given to him by the defendant, which one of the witnesses testified was in the following form : "Received of Joseph Wiseman seven dollars, *for the right to drain through my premises*," a receipt singularly analogous to the present. The plaintiff's contention there was, that a valid contract must be implied from these words; that the defendant thereby agreed, for the express consideration, to cede to the plaintiff the right to drain through his lands, and that equity would enforce the agreement. But the court denied *the completeness* of the contract to be implied from this receipt, even when read in the light of the oral testimony *behind and supporting it*, and denied relief because the agreement was *not entirely clear in all its parts*. The court also denied relief because there had been no part performance within the rules laid down in courts of equity. Referring to the latter head, Danforth, J., observed that the receipt contains " a mere license or permission to drain, and *no agreement to convey an easement*, nor is the license coupled with any interest in the lands. It was, therefore, revocable, *and its revocation did not operate as a fraud upon the plaintiff. His expenditures were trifling*, and, for aught that appears, have been more than repaid in the use already had by the plaintiff of the privilege given to him."

The conclusion of the court upon this branch of the case was that " the agreement *to be implied* from the receipt was undoubtedly good as a license, giving to the plaintiff immunity while acting under its privilege, *but no vested right entitling him to its use and enjoyment against the will of the defendant*."

The case of *Cronkhite* v. *Cronkhite* is also very much in point. There the parol agreement was for the laying down of pipes to carry water from a spring on the licensor's lands—first, to the licensor's buildings, and, second, to buildings on the licensee's lands. The referee found, as a fact, on the oral testimony, " that it was agreed that Henry C. Cronkhite (the licensee) should bear one-half the expense and perform half the labor of procuring and laying down the logs and pipes, etc.; and that, in consideration of such expenditure and labor, he should have a right to take water from said spring through logs and pipes in perpetuity." Upon this Miller, J.,

observed that " the testimony upon the trial established a parol con-
tract between John C. Cronkhite (the licensor) and Henry C. Cronk-
hite, whereby Henry C. was to take and use the water, and *there was
proof showing that both parties acted in accordance with that agree-
ment. Money was expended by Henry C., pipes were laid down
and improvements made* in connection with the use of the water,
but there was no specific agreement as to the size of the pipes, the
amount of water to be carried through them, *how far below the sur-
face they were to be* laid," etc.

It was accordingly held that the agreement could not be enforced.
" Disagreements," said Judge MILLER, " might also arise as to how
and when and where the pipes should be laid and repaired, and as
to the manner in which the spring should be protected, and thus it
would be difficult for a court of equity to determine the precise
character of the agreement. The evidence given upon the trial
was too vague and uncertain to establish a valid agreement in per-
petuity, such as the law recognizes. The statute requires an agree-
ment of this character to be in writing, expressing a consideration;
and to establish it otherwise, by adverse possession, the proof should
be *entirely clear* as to the nature and *specific character* of the agree-
ment, so that it can be eventually carried out and enforced."

In *Kincaid's Appeal* (66 Penn., 411) an instrument of far greater
weight and importance than the present receipt was spoken of as a
" very loose paper." The court there refers to the instrument as
follows: " The certificate set out in the bill states that the subscriber,
in consideration of $10, paid by him, *is entitled to two burying lots*
in the burying ground of said church, *to have and to hold the said
lots* for the use and purpose, and subject to the conditions and regu-
lations mentioned in the deed of trust to the trustees of said church.
* * * We cannot, however, consider this certificate as evidence
of a grant *to the lot-holders of any interest* or title in the soil;
* * * taking it for a grant, it is only for the life of the lot-
holder, *and at the very time it would be needed for his own
interment, his title would cease. Without any accompanying
conditions and regulations it is a very loose paper.*"

In *Dwenger* v. *Geary* (113 Ind. 106), where the Coppers case is
commented upon, quoted from and approved, the receipt seems to
have been in substantially the same form as the present. The court

found that John Geary had never received any conveyance; "the only instrument executed," said the court, "was a receipt for money; this and nothing more does he (Geary) hold in the form of a written evidence of title. It is clear, therefore, that he is a mere licensee. All he has is a license, and that he holds from the church. This license conveys no interest in the land · it does no more than confer a privilege."

In that case the Supreme Court of Indiana was not considering the possibility of specifically enforcing such a privilege. The question was whether an injunction should be granted to the authorities of the church, *restraining the receipt holder from attempting to exercise the privilege implied by its terms;* and such injunction was granted. And in *Maryland* (*Partridge* v. *First Independent Church*, 39 Md., 637) it was held that a certificate with words of grant to the party, "his heirs and assigns forever," conferred "no title or estate in the soil, nor could it operate as a grant of an easement, because it was not under seal nor was it acknowledged and recorded so as to be effective to convey such an interest."

It seems useless to multiply authorities upon this point, for the present case is not as strong in its equity as the weakest of those already cited. In the absence of any parol testimony, and standing upon the naked possession of the receipt, how is it possible here for a court of equity to decree specific performance of *a supposed contract for the grant of an easement?* We are asked to imply all the terms of a complete and specific agreement from the words in the *receipt* for the amount of purchase-money of a grave two feet by eight in Calvary Cemetery "— the two feet by eight being located beneath the superintendent's signature as "Grave 9, Plot F, Section 8, Range 56."

The amount of purchase-money *of a grave.* Was the contract completely fulfilled when "a grave" was opened for Mrs. McGuire and her body permitted to rest there? Can it be said that even that question is entirely free from doubt? Or, was the contract personal to McGuire and did it terminate, as suggested in *Kincaid's Case* (*ubi supra*), upon his death? If the agreement, to be implied from the receipt, passed to McGuire's administrator, what actual right thus passed? If this receipt implies a property right to burden the soil with as many bodies as can be decently placed in the located two feet by eight, can this administrator renew his demand from

time to time? If so, can he place there, for a consideration paid to him as the representative of McGuire's estate, the bodies of strangers in blood to the family, provided they are Catholics? Could McGuire himself have done that under this receipt? And in this process of burdening the soil with numerous bodies, in or out of the family, how deep might McGuire have dug, and how deep may this administrator now dig? The mere outlining of these questions clearly indicates that the receipt, to again quote the language used in *Kincaid's Appeal*, "without accompanying conditions and regulations, is a very loose paper." We look in vain throughout this case for any such *accompanying conditions* or regulations. Even the cemetery rules, so far as they were read in evidence and appear in the printed case, shed no light upon the obscurity involved in the language used in this receipt; nor do they indicate, directly or indirectly, the precise terms or the specific conditions of the agreement. Nor does the undertaker's testimony, as to the usage of the cemetery, establish any definite rule, either as to the allowable depth of the grave or as to the number of bodies which the receipt holder is permitted to place there, or as to the character or personality of the occupants· The entire testimony on that head was as follows:

"I have been in the undertaking business about fourteen years, and during that time have made a great many interments in Calvary Cemetery, and am familiar with its regulations; in the old ground graves are *usually* dug eight feet deep, and in the new ground *now* they are dug nine feet deep; the grave described in plaintiff's Exhibit A is in the old cemetery; *it is usual to bury more than one body in a grave.* Q. How many bodies can be safely and properly buried in this grave? A. Four bodies, *and sometimes more;* I have got *three* in mine, and there is room for *two more;* I have known numerous cases *in which two or three bodies* have been buried in one grave in Calvary Cemetery; I can name my own case; my sister and father and mother; and room for two more."

The case, on this head, is thus clearly within the principles laid down in *Wiseman* v. *Lucksinger* and *Cronkhite* v. *Cronkhite*, above cited.

It is also within the rule as to part performance. The act of

permitting Mrs. McGuire's body to burden the soil was in no proper sense an act of part performance. *It was simply a partial enjoyment of the privilege.* It was an act *of burden* on the part of the licensor, of enjoyment on the part of the licensee. McGuire never expended a penny upon the grave. The trustees were guilty of no such conduct as to lead McGuire, to quote again Judge DANFORTH's words in *Wiseman* v. *Lucksinger,* "to erect permanent works or valuable and lasting improvements." Nor was there any other fact which would make the revocation of the license or the refusal to fulfill the implied obligation, whatever it may have been, a fraud upon McGuire or his legal representatives. It does not appear that McGuire ever placed even a head-stone upon his wife's grave. The part performance, therefore (*or the complete performance as the receipt may be viewed*), was wholly on the side of the licensor. And, as we pointed out in the Coppers case, the payment of the consideration did not operate as such part performance. (*Coppers Case,* 21 Hun, 194, citing Story's Eq. Juris., § 760; *Rhodes* v. *Rhodes,* 3 Sandf. Ch., 284; see, also, on this point of consideration, the cases already cited of *Wiseman* v. *Lucksinger* and *Cronkhite* v. *Cronkhite, supra.*)

I have thus considered this case precisely as though the rights of property claimed by the plaintiff had come from a secular cemetery. But, when we consider that the transaction was with a strictly denominational cemetery, the weakness of the plaintiff's equity is still more strikingly apparent. The record contains an express admission by the plaintiff of the allegations in the answer, that the cemetery lands in question were set apart and *consecrated* with appropriate religious ceremonies, by the ministry of a priest or priests of the Roman Catholic church, *for the exclusive purpose* of the burial of the remains of persons *who may die in communion with that church.* McGuire was a Catholic. As such, he entered the denominational domain. As such, he obtained the receipt in question from the denominational cemetery office. What transpired at the time he so obtained that receipt, is, as we have already seen, entirely unknown. What may safely be affirmed, however, is that he sought burial privilege in a denominational cemetery, *thus consecrated to the exclusive purpose* of the burial of those *dying in communion with the church.* That denominational

rule must certainly be implied (as part of the agreement) from the receipt, and the surroundings under which it was sought and obtained.

It is as though the receipt had read : Received, from John McGuire ten dollars, being amount of purchase-money of a grave two feet by eight in the ground of Calvary Cemetery, which has been *consecrated for the exclusive purpose* of the burial of the remains of persons who may die in *communion with the Roman Catholic church.*

That is the parol agreement, the only one which can possibly be implied. The plaintiff, too, recognized this, for he averred in his complaint that McGuire died in the Catholic faith *and in communion with the church.* And it was only when, upon the trial, the difficulty of proving, affirmatively, the latter assertion weighed upon him that he struck it from his complaint and claimed that it was superfluous. Now, who is to determine whether McGuire died in that communion ? Mr. Justice DANIELS admits that it is the hierarchy, but he thinks that the chosen judges of the church must proceed according to the principles of the common law ; that they can only act *upon evidence* (as applicable to church law) ; that the accused is entitled to a hearing ; and that if those " first principles " which govern in the ordinary administration of justice are ignored, the authorities of the church exceed their jurisdiction when they decree that the holder of the receipt died out of communion with the church. With great respect and diffidence, I venture to differ with the conclusion.

In my judgment, McGuire contracted for the exclusive jurisdiction of the church with regard to the question of communion. Spiritual questions are solely for the determination of the church authorities. Over their action in the domain of church discipline or excision the civil courts exercise no revisory power. (*Shannon v. Frost,* 3 B. Monroe, 253.) There the court said : "We cannot decide who ought to be members of the church, nor whether the excommunicated have been justly or unjustly, regularly or irregularly, cut off from the body of the church. We must take the fact of expulsion as conclusive proof that the persons expelled are not now members of the repudiating church, for, whether right or wrong, the act of excommunication must, as to the fact of membership, be law to this court."

The same doctrine was maintained by the Supreme Court of Penn-

sylvania in *German Reformed Church* v. *Seibert* (3 Barr. [Penn.], 291), and the additional suggestion was there made that under no circumstances would the civil courts interfere until the wronged party *had exhausted his remedy within the church by appeal to its highest tribunal.* This doctrine is peculiarly applicable to the present case, where it is conceded that an appeal to Rome lay from the decision of the ordinary of this diocese, forbidding the burial of McGuire, and that no such appeal has been taken. The language of the Pennsylvania court is exceedingly apt, and I quote the most material part of it :

"If, therefore, the relator is injured by the decree of the consistory, his remedy is by appeal to a higher ecclesiastical court, which, no doubt (and it is indecorous to suppose otherwise), will afford him redress, by reversing whatever may have been done by the inferior court, inconsistent with the canons of the church. That the power of the classis and synod is advisory only, matters not ; as we cannot suppose their decision will be disregarded, and if it should be, it will then be time enough to seek redress from the civil authorities. The decisions of ecclesiastical courts, like every other judicial tribunal, are final ; as they are the best judges of what constitutes an offense against the word of God and the discipline of the church. Any other than those courts must be incompetent judges of matters of faith, discipline and doctrine."

To the same effect, in substance, are the decisions in *Dieffendorf* v. *Reformed Calvanistic Church* (20 Johns., 12) ; *Robertson* v. *Bullions* (9 Barb., 64 ; affirmed, 11 N. Y., 243) ; *People ex rel. Dilcher* v. *German U. E. St. Stephen's Church* (53 id., 103) ; *Dwenger* v. *Geary* (*supra*). In the latter case the court said that "no power save that of the church can rightfully declare who is a Catholic. The question is purely one of church government and discipline and must be determined by the proper ecclesiastical authorities." And again : " Under the discipline and doctrines of the church, as enforced by the functionaries invested, with the power and duty of deciding questions of doctrine and discipline, James Geary was not a Catholic, and this decision is *final and conclusive.*"

On the same principle the decision that McGuire, although a Catholic, did not die in communion with the church, was final and conclusive until reversed, reversed not by the civil courts, for they have

no jurisdiction under a constitutional system which happily separates church and State, but by the highest authorities of the church itself. To attempt to exercise jurisdiction in such matters upon the plea of want of jurisdiction in the church authorities of first instance, would be the entering wedge whereby the symmetry of our governmental system with regard to church and State might readily be destroyed. And, after all, what do we question when looking into the Ordinary's jurisdiction, *but his procedure?*

Shall we go further and decide that he has no jurisdiction, within his sphere, to decree that a Roman Catholic died out of communion with the church, because the testimony upon which he acted was unsupported by an oath? Must he also notify the next of kin, or the executor or administrator of a proposed hearing, produce his witnesses in their presence, permit them to cross-examine and then to produce their own witnesses? Is he without jurisdiction if he deny them counsel? And all this while the dead body is awaiting his decision. Where does the right to question the jurisdiction begin, and where does it end?

It seems to me that the Ordinary's jurisdiction in spiritual matters cannot be questioned by the civil courts at all. He may act upon the best light he can obtain, however informal the source, and we cannot review his judgment, however out of touch with common-law principles may have been his means of ascertainment. If the ordinary acts capriciously or arbitrarily, there is an appeal to Rome. If the appellant is there again defeated, it will be time enough to inquire whether he has or has not contracted for the possibility of such injustice, and whether, even then, the facts and the law applicable thereto would warrant a court of equity in entering the spiritual domain to redress a mixed temporal and spiritual wrong. For we cannot overlook the fact, which pervades this entire controversy, that it is not the mere right to be buried in two feet by eight of ordinary earth which the plaintiff seeks to enforce, but plainly the right to be so buried in *consecrated* earth. It is thus the spiritual right which, in substance, he asks us to enforce; that is, the agreement, so to speak, for *consecration* predicated upon *communion*. The rest is but a temporal incident. The world is all before this plaintiff to secure for his testator mere burial. The secular cemeteries, with their regular and binding deeds, were open to McGuire, and are yet

open to his representatives. But that is not what is required or desired. What the plaintiff insists upon is the burial of McGuire in the same consecrated earth where the body of his wife now rests. That, however, is something which the civil courts are powerless to compel, under such a contract or understanding as that which here forms the basis of the plaintiff's rights and of this action.

The Guibord case (*Brown* v. *Curé of Montreal*, L. R., 6 Privy Council, App. 157), for which the learned counsel from the appellant quotes so fully, has no conceivable application here. That case proceeded upon rules referable to a system in which church and State are blended. Under that system, a British subject is entitled to burial in his parish churchyard without regard to contractual locality, and the question of his right to such burial is essentially for the civil courts, in the exercise of their *quasi* ecclesiastical jurisdiction. The Privy Council, in opening the discussion, declared that the question to be decided was " the right of Guibord to interment in the ordinary way in the cemetery of *his parish*. It may be observed that the Curé and Marguilliers are only proprietors of the parochial cemetery in the sense in which a parson in England is the owner of the freehold of the churchyard, that is to say, subject to the right of the *parishioner to be buried therein*."

In that case the church authorities offered to permit Guibord's burial in that part of the cemetery *which was unconsecrated*. But the court determined that he was entitled to be buried in the consecrated part, and even queried whether they might not command the church to so bury him with its ordinary and appropriate religious rights and service. " The payment of dîmes to the clergy of the Roman Catholic church," said the court, " by its lay members and the rateability of the latter to the maintenance of parochial cemeteries *are secured by law and statutes*. These rights of the church must beget corresponding obligations, and it is obvious that this state of things may give rise to questions between the laity and clergy which can only be determined *by the Municipal Courts*."

Even the observations made by Lord Phillimore, that "if this church were to be regarded merely as a private and voluntary religious society, resting only on a consensual basis, courts of justice are still bound, when due complaint is made that a member of the society has been injured as to his rights in any matter of a mixed, spiritual

and temporal character, to inquire into the laws or rules of the tribunal or authority which has inflicted the alleged injury," must be taken as applicable to the parish churchyard system, that is, to *the parish churchyard or cemetery* of any private and voluntary religious society in the kingdom, resting only on a consensual basis.    The general right of a British subject, a member of such society, to burial in its parish churchyard or cemetery is thus held to be a matter for consideration and adjudication by the courts construing the laws or rules of such consensual society.    Throughout the case there is not a suggestion of contractual relation nor of a right to burial in any particular plot.    It was simply a judicial review, authorized by the law of England, of the action of the Roman Catholic church in Canada; and thereupon the Privy Council examined the laws of the church and held that its authorities had erred.    We have no such system of jurisprudence here.    In this, I must be permitted to say we are fortunate, for while human nature is what it is there must always be more or less of religious faction, with its intensity of bitterness, in every theological establishment, however well disciplined and authoritative.

And I can conceive of nothing more surely tending to weaken respect for judicial authority than the bringing of such factional controversies before the ordinary tribunals of our country, and making the people's judges final arbiters thereof  In conclusion, I must say a word with regard to the present record.    I have been somewhat embarrassed by the peculiar character of the findings made by the learned judge at Special Term.    They seem to me to be inconsistent and contradictory in some important particulars, and they can only be reconciled by treating the eleventh, thirteenth and fourteenth findings of fact as really conclusions of law, erroneously deduced from the accurate findings of fact numbered second, third and fourth.    These latter findings are supported by the uncontradicted testimony, while the subsequent findings to which I have referred, as well as the first and second conclusions of law, are implications not borne out by such testimony.    But as, upon the pleadings and proofs, the latter undisputed, and the findings of fact really applicable to such proofs, the third legal conclusion (namely that the complaint be dismissed) was fully justified, the judgment appealed from should *be affirmed, with costs.*

VAN BRUNT, P. J.:

I concur in the conclusions arrived at by Mr. Justice BARRETT. I think that he has conclusively shown that whatever contract the facts proven establishes, if any, is of so vague and indefinite a character that it cannot be specifically enforced by any court. I think that he has further shown that all that the deceased received was a license which was revocable. No grant or irrevocable right or easement was ever given him, and could not be by the paper he received, without, in effect, repealing the provisions of the statute in respect to conveyances of interests in land.

If it were possible to hold that there was a valid contract for burial only, and not for an interest in land, there seems to be another ground which is fatal to the plaintiff's claim. There is no evidence but that if the deceased's rights of property have been invaded, his estate can be entirely indemnified through an action at law for damages. If it is urged that damages cannot indemnify for the deprivation of burial in this consecrated ground, then the court is called upon to decree that a church shall administer to one who claims to be of its communion its religious offices, and the court is called upon to determine whether the person is or is not in full communion with the church.

I think that it will hardly be claimed that a court could rightfully direct a church to administer a sacrament to a person who claimed to be entitled thereto, but whom the church authorities had declared not so to be, and yet, in the case at bar, this is substantially what the court is called upon to do. It is asked to compel the burial of this man in a particular location, apparently because it is consecrated ground, because, if it is not burial in consecrated ground which is asked for, but simply burial, then sepulchre in a non-denominational cemetery would accomplish the result, and damages would compensate for all invasion to property rights.

Under our form of government we do not think that courts can be called upon to compel churches to administer religious rights to persons claiming to be its members, or perform an act in any way impressed with that character.

The judgment appealed from should be affirmed, with costs.

(After stating the facts, as set forth at the commencement of this case, Judge DANIELS proceeded in his opinion as follows):

Daniels, J. (dissenting) :

By the language of the instrument, and the location of the grave, his representative was entitled to insist upon the right of the intestate to burial in it if he had observed the laws and discipline of the church, under whose authority the property was acquired and controlled. The instrument as it was issued, and the grave was located, created a privilege or license to this effect without conveying a title to the land. (*Kincaid's Appeal*, 66 Penn., 411; *Page* v. *Symonds*, 63 N. H., 17; *People ex rel. Coppers* v. *Trustees*, 21 Hun, 184.) And the adminis trator was empowered to secure this interment, if the intestate had complied with the laws of the church controlling the cemetery, up to the time of his decease. (2 Blackstone's Com., 508; *Williams* v. *Williams*, 20 L. R., Ch. Div., 659.) And that was the view which was adopted and followed in the decision made at the Special Term. For it was there held by the court that the plaintiff, as the personal representative of the deceased, was vested with whatever right existed to enforce the contract to be implied from or contained in this instrument. The action accordingly did not fail because of any infirmity in the right of the plaintiff as the personal representative to maintain it, if that could be done legally, upon the facts made to appear by the evidence.

Upon the trial of the action accepted compilations of the laws of the church were proved and read in evidence, and these laws or regulations defined and declared the causes for which the interment of a deceased person might be forbidden in the consecrated cemetery and grounds of the church; and, so far as they existed and were applicable to this subject, they were required to be observed in the determination of the controversy which has arisen concerning the right of the deceased to burial in this cemetery. By these laws or regulations it was necessary that the deceased should have been during his life a member of the Catholic church. If he were not such a member, then his personal representative could claim no right to the interment of his remains in these grounds. (*Dwenger* v. *Geary*, 113 Ind., 106.) But the right to the interment of these remains was not denied for want of any compliance on the part of the deceased with this regulation or requirement. Neither could it have been, for it was stated positively by the daughter of the

deceased, who was sworn as a witness upon the trial of the action, that her father was a member of the Catholic church in his lifetime, and she was no further interrogated as to the correctness of this statement made by her. It appears to have been accepted as truthful, and it was assumed, during the progress of the trial, that he was a member of this church; and the complaint, as it is contained in the case, asserts that to have been the fact, for no more was stricken out, on the application of the plaintiff, than the statement that he died in full communion with the church, leaving the complaint as it now forms a part of the case with the allegation that he did die in the faith of the Roman Catholic church; and it was not for want of any additional evidence as to this fact that the interment of the remains in the cemetery was denied by the authorities of the church or by the trial court.

But that denial appears to have proceeded upon the conclusion adopted by the court that it properly belonged, under the usages and discipline of the church, to the decision of the Ordinary or the Bishop of New York to determine whether the deceased was entitled to be buried in this cemetery; and the Ordinary having made a decision adversely to this right, upon evidence sufficient to give him jurisdiction to act, the remains were not entitled to burial in the consecrated ground of the cemetery.

It is undoubtedly the law that the courts will not review conclusions or decisions of the ecclesiastical authorities of the church relating to mere matters of faith, practice or discipline. (*Dutch Church* v. *Bradford*, 8 Cow., 457; *People ex rel. Dilcher* v. *German, etc., Church*, 53 N. Y., 103; *Shannon* v. *Frost*, 3 B. Monroe, 253; *German, etc., Church* v. *Seibert*, 3 Barr. [Penn.], 282, 291.) But this exclusive authority vested in the church is not applicable to the disposition or determination of rights or interests in property, or those derived from contracts lawfully entered into. As much as that was stated in *Bouldin* v. *Alexander* (15 Wall., 131.) And it necessarily follows, from the nature of the transactions through which rights or interests in property by virtue of contracts may be created, that they are to b governed by the secular law, as they are distinguishable from ecclesiastical subjects, and may only be divested, impaired or forfeited by reason of some act or circumstance upon which the right

or contract has been made dependent, or for the violation of rules or regulations which, by the sanction and intention of the parties, have been made applicable thereto. Rights of this description are recognized and protected by the general law of the State, and that has carefully defined the manner in, and the causes for, which they may be lost or forfeited. And under that law, if the deceased, as a matter of fact, had violated or failed to observe any of the laws or regulations of the church applicable to and controlling this contract, then the plaintiff could not claim or insist upon his interment in this cemetery.

But neither one of these rules or regulations vested the clerical authorities of the church with jurisdiction to determine this right of interment in such a manner as to conclude the party entitled to insist upon the observance of this agreement. No hearing whatever has been provided for, or took place before the vicar-general, by whose order the interment of the remains in these grounds was forbidden. But he acted solely upon information which he had received from no directly responsible source, in reaching the conclusion that the deceased had forfeited his right to this burial. This was done, according to his own testimony, upon mere information; not a safe subject to be relied upon in any case for the determination of rights of property or contract, and the determination was made without any notice to, consultation with, or hearing of any person entitled to represent the deceased or to controvert the correctness of the information received by this clerical official. And under these circumstances the law will not permit a determination arrived at in this manner, to forfeit the right which the deceased may have secured through this instrument to burial in the consecrated cemetery of the church. The legal principle, on the contrary, has been declared to be that "there is nothing which our law denounces more explicitly than the adjudication of the rights of a party, without offering him an opportunity of being heard in his defense." *People ex rel. Waldron* v. *Soper* (3 Seld., 428, 431) and *Loubat* v. *Le Roy* (40 Hun, 546), follow and enforce this principle.

The determination which, in fact, was made in this manner, proceeded upon information that the deceased had died in the Academy of Music, at a meeting addressed by Dr. McGlynn, who had been excommunicated from membership in the Catholic

church, and that he was, in reality, a confederate and abettor of this deposed priest. The vicar-general had been informed that McGlynn had abused and denounced the Pope, and it was considered a scandal for any good Catholic to be present at his meetings. His own testimony is that he did not know the deceased, but that he had "heard that he had been applauding Dr. McGlynn in abusing the Pope a few minutes before his death."

Upon his cross-examination he testified that it was a public fact that the deceased had died there. Thereupon the following questions were put to and answered by the witness: Q. I was not there; I did not see him die; you say it came up from the trustees; by what means? A. The undertaker called upon them. Q. How do you know? A. The clerk told me. Q. His name? A. Mr. Brennan. Q. Where did he tell you so? A. Oh, I can't remember the exact spot. Q. When did he tell you so? A. Either the day after his death or the following day. Q. What was said? A. Simply the fact that he died at the Academy of Music. Q. And on that you issued the order forbidding the burial? A. I did, sir.

These reports, with the exception of that as to the fact of the deceased dying at the Academy of Music, were of a loose and unreliable character, and could not legally have been the basis of binding action by the vicar-general. They were in no sense so authentic as to warrant or justify the conclusion that the deceased approved of the actions or expressions of McGlynn, or applauded any remarks or imputation made by him, at the meeting in this manner referred to, or at any other, and afforded no grounds of jurisdiction upon which he could legally or properly act in declaring the right of the deceased under this contract to have been forfeited by any misconduct on his part. The evidence was not of such a nature as to be acted upon, and, therefore, afforded no jurisdiction over the subject-matter, and the want of jurisdiction, or the power to act, may be questioned in the courts by legal proceedings whenever the legality of the action taken shall be brought in controversy. (*Ferguson* v. *Crawford*, 70 N. Y., 253, 257; *Cagwin* v. *Town of Hancock*, 84 id., 532, 541; *Craig* v. *Town of Andes*, 93 id., 405.) And to afford jurisdiction by way of support for *quasi* judicial determination, it must proceed upon at least colorable evidence of the fact. But here no such, or, indeed, any, evidence was supplied,

and this, as well as the circumstances that the consideration given to the subject was wholly without notice, or an opportunity to be heard by any person interested in protecting the right of the deceased against these aspersions, rendered the determination which was made, inoperative for the want of authority over it.

But beyond this, according to the laws and regulations of the church, which have been made a part of the evidence in the case, the deceased could not be deprived of the right to burial in this cemetery by a simple determination that it had been forfeited or lost by him, for the laws of the church have made this disability to depend entirely, where the deceased shall have been a member of the Catholic church, upon some act, misconduct or omission of the deceased.    These laws and regulations have in no manner provided that the right to burial in the cemetery, under an instrument of this description, can be taken away merely by the dictum or decision of a member of the church hierarchy.    But the right to such burial by these laws has been declared to be lost, or forfeited, only by reason of actual misconduct on the part of the person in whose behalf it may in this manner be claimed.    It is a penalty imposed for misconduct either by means of affirmative acts or delinquent omissions to act on the part of the deceased.    Among the causes for which burial in consecrated ground may be refused are the fact that the deceased died a public sinner, or that he failed to perform some affirmative duty forming a part of his obligations as a member of the church, or had committed some act of scandalous misconduct. The law of the church in these and other matters attaches the loss or forfeiture to the act itself, or to the delinquency of the party, and not to a mere dictum or determination of any member of the clerical authority of the church; and to bring this case within these laws it was necessary, therefore, that the deceased should be shown, as a matter of fact, by way of defense to the action, to have violated, or become chargeable with, some act of misconduct prohibited by them, thereby forfeiting, under their authority, his right to burial in the consecrated ground of the church.    But no such proof in any form has been included in or made a part of this case.

The evidence concerning the conduct of the deceased was obtained from witnesses either related to or knowing him well, and seeing him at meetings of the Anti-Poverty Society, and of

the parishioners of the church of which McGlynn had previously been the pastor. But no witness testifies to the fact that he was present on any occasion when McGlynn addressed the people who were assembled, or that he in any manner had applauded, or approved of his conduct or sentiments, or the principles which he endeavored to maintain. And upon the occasion when he was at the Academy of Music, the proof is positive, from at least two witnesses, whose evidence is not contradicted, that he died half an hour before the proceedings of the meeting had commenced, and before Dr. McGlynn made his appearance. All that was shown against him was that he was present at the meetings already referred to, but not when Dr. McGlynn was either officiating or making any remarks or allusions whatsoever. There was no evidence that upon any occasion he had either misconducted himself or neglected any of his duties or obligations as a member of the Roman Catholic church. And that was the view which was adopted by the judge presiding at the trial, for, by his fifteenth finding, he found the facts to be "that the said John McGuire did not at any time after the said 22d day of November, 1870, violate any of the rules or regulations for the management of the said cemetery and interments therein, theretofore made by the defendants, nor any laws of the Roman Catholic church theretofore made respecting the burial of the bodies of its deceased members."

And in this state of the evidence, as it cannot be affirmed that he had violated any rule or regulation of the Catholic faith, it follows that he did not forfeit his right to burial in this cemetery. If upon a mere mistaken view of the facts produced by unfounded reports, which is all that was before the vicar-general, this right of burial may be forfeited, then no security can certainly exist for the protection of any person acquiring and paying for this privilege of burial. For even the most correct religious deportment may be sacrificed by the malignant and untruthful reports of persons misrepresenting the acts, conduct or sentiments of deceased persons. Instead of the right being maintained, as the law requires it to be, as one of a proprietary character, it may then be overthrown or forfeited after the decease of the party securing it, without any available means of avoiding the result. No Catholic, whatever his standing may be, will be entirely removed from this danger, if upon

mere reports, turning out as they have in this instance to be untruthful and unfounded, he can be deprived of burial in the consecrated ground of his church by the action of one of its officials induced by reliance upon such reports. The only safety which exists is that already indicated, in reliance upon and maintaining the laws of the church itself, which require not rumors or information, but that actual misconduct or the omission to observe specific obligations shall be proven to have taken place before a contract or instrument of the description of that, for a good consideration, delivered to the deceased, shall be forfeited or avoided. That proof is wholly wanting in this case, and the judgment should be reversed and a new trial ordered, with costs to the plaintiff to abide the event.

Judgment affirmed, with costs.